ANDREWS et al. v. SCHREIBER.

(Circuit Court, W. D. Missouri, W. D.   March 4, 1899.)

1. SALE—COMPLETION OF CONTRACT—ACCEPTANCE OF OFFER BY TELEGRAPH.
   An offer to sell, and an unconditional acceptance, by telegraph, constitutes a completed contract, to which conditions cannot be thereafter added, except by mutual agreement.

2. SAME—DELIVERY—TRANSFER OF BILLS OF LADING.
   Plaintiffs contracted with defendant, who resided at a distance, for the purchase of wheat, to be shipped by a common carrier.  By the custom of the market, understood by both parties, the grade and weights were to be fixed by the inspectors at the point of destination.  Defendant made shipments, taking bills of lading to himself, to which he attached drafts, which were forwarded for collection, and accepted and paid by plaintiffs.  Held, that there was a delivery of the wheat under the contract on the payment of the drafts and transfer of the bills of lading, though it had not then been inspected or weighed.

3. SAME—IMPLIED WARRANTY.
   Under such circumstances, there was an implied warranty on the part of the defendant that the wheat shipped was of the grade called for by the contract, and where, on inspection, it fell below such grade, the plaintiffs were not obliged to return it, but had the right to retain it, and sue for the breach of warranty.

4. SAME—ACTION FOR BREACH OF WARRANTY—EVIDENCE.
   In an action by a purchaser for breach of warranty, on the ground that wheat delivered by the seller was below the grade called for by the contract, evidence is not admissible in defense to show that a profit was realized by the plaintiffs.

The plaintiffs, who are commission grain merchants at Kansas City, Mo., brought action against the defendant, a shipper of grain from Otis, Kan., on a contract calling for the sale of 15,000 bushels of No. 2 hard wheat, at 57 cents per bushel on the cars at Otis, Kan., to be inspected by the state inspector and weighed at Kansas City, Mo., after deducting the expenses of weighing and inspection.

The second count of the petition upon which the court rendered judgment claimed as damages a shortage in the quantity shipped by the defendant; and also for damages in the difference in the quality of the wheat shipped; also for profits which would have been realized by the plaintiffs on the quantity and quality of the wheat called for by the contract, had the same been delivered; and also for an excess of drafts paid over and above the correct quantity of the wheat shipped.  A jury being waived, the cause was submitted to the court on the pleadings and the evidence.  The court made a special finding of facts, and declared the law to be that plaintiffs are entitled to recover of the defendant the sum of $494.68 on account of drafts paid over and above the correct quantity of wheat shipped; also the sum of $166.95, difference in the market value of No. 2 hard wheat, which should have been shipped, and No. 3 hard wheat, actually shipped; and also $41.90, damages for the failure of the defendant to deliver the full quantity of 15,000 bushels of wheat called for by the contract.  And the court also found against the defendant on his counterclaim for damages based upon the alleged conversion by plaintiffs of the No. 3 hard wheat shipped by defendant to plaintiffs; which defendant, in his counterclaim, asserted the plaintiffs were unauthorized to appropriate under the contract.  The further essential facts sufficiently appear from the following opinion of the court.

Meservey, Pierce & German, for plaintiffs.
Lathrop, Morrow, Fox & Moore, for defendant.

PHILIPS, District Judge (after stating the facts as above). The important question, lying at the very threshold of this controversy, is, when was the contract for the shipment of wheat by the defendant to the plaintiffs entered into and completed? Both parties are agreed, in effect, by the pleadings, and in argument before the court, that at some time in July, 1897, these parties did make a contract whereby the defendant agreed to ship to the plaintiffs, and the plaintiffs to take on the railroad track at Kansas City, 15,000 bushels of No. 2 hard wheat, to be delivered within 15 days, at 57 cents per bushel, less inspection and weighing charges. And the parties are further agreed that the defendant was to load the wheat on the cars at his point of shipment (Otis, Kan.), and that he would, on the shipments, draw on the plaintiffs for the apparent quantity thereof, as ascertained by the railroad weights, less a specified drawback on each car, and attach his draft to the bill of lading, to be sent for collection from the plaintiffs; subject to the further condition, founded upon the recognized custom between such dealers, that the wheat, on reaching Kansas City in the cars, was subject to inspection under the state inspection laws, either of the state of Kansas or of the state of Missouri, where the car might be delivered; and the weights at Kansas City, and the grade as fixed by the inspector, should be conclusive; and, further, that, on receipt of the draft drawn by the defendant, the plaintiffs would honor the same.

As the whole negotiations between the parties were conducted by correspondence in the form of letters and telegrams, recourse must be had thereto in determining the question as to when the contract was completed. The proposition to open up this trade between the parties originated with the defendant. On July 22, 1897, he telegraphed the plaintiffs as follows: "Offer ten, fifteen thousand bushels two hard wheat sixty net." On the same day plaintiffs replied thereto as follows: "Market over cent lower. Buyers all scared. Sixty-seven track here best can do, fifteen days. Quick reply." On July 23, 1897, plaintiffs again wired defendant: "Market cent and a half lower. Do you want sell at sixty-seven track here?" This was followed by the following telegram from plaintiffs to defendant on the same day: "Think can work your fifteen wheat net you fifty-six half, if offered quick." To this defendant replied: "Take fifty-eight net fifteen thousand bushels two hard." To this plaintiffs immediately replied: "Market closed three cents lower; fifty-six best can do. Quick reply. Will sell lower sure." The next day, July 24th, defendant telegraphed plaintiffs: "If you can use it at fifty-seven, will sell." To this plaintiffs immediately replied: "Accept your fifteen thousand 2 hard fifty-seven track, Otis. Rush shipment." And on the same day plaintiffs sent defendant letter by mail, which was evidently written before the receipt of defendant's telegram of that date, and which it is not necessary, therefore, to consider. But, following this letter of the same date, plaintiffs mailed to the defendant the following letter, to wit:

"We have now your wire offering fifteen thousand bushels 2 hard at 58 cents [it is admitted by both parties that this should be 57 cents instead of 58 cents] on track, which we now confirm for fifteen-day shipment. Please let

them come forward fast as possible. * * * We are pleased to have made this starting trade with you, and hope to do more business with you. Keep us closely advised of what you have to offer, and will make you very close price. Please bill wheat to us here, making draft without exchange, leaving us fair margin."

On the same day following defendant's telegram of that date to plaintiffs, he sent to plaintiffs the following letter:

"We expeck you peple to give us 10–15 day. But I belive we can mack it next week as we sheap 3 lagh cars mondy morng. Now as you ar stranzer to me in case some of the wheet sult file to graat I want you to notify me by wir as I hav Mr. E. D. Fisher Com. to look after may biznes in K. C. so I will mack draft within 10 to $20.00 per car and if you want some refrance abut me ce Mr. Fisher and J. V. Brinkman Co. Bank at Gt. Bend as I du may bizness thru ther bank."

The plaintiffs made answer to this letter on July 26th, as follows:

"We have your letter of Saturday. We will look very carefully after the grading of your wheat here, and also after the weights. It will be all right if you make drafts, and leave us $10.00 to $20.00 per car. We note you refer to E. D. Fisher and your Great Bend Bank, which are entirely satisfactory. We think no references would be necessary, however, as your reputation is all right. We must congratulate you upon having made a good sale Saturday. The wheat would not be worth as much money to-day. Please ship as fast as possible, and let us know when you have more to sell."

It is evident, from the correspondence, that letters passing between these parties were received the day following their dates. The shipments made by the defendant on this correspondence were made on the dates, inclusive, beginning on July 26th and ending August 4th.

A contract between parties is complete whenever the minds of the contracting parties meet upon a given proposition. When the defendant, on the 24th day of July, 1897, telegraphed to the plaintiffs offering his wheat of the quality and grade proposed, at 57 cents, and the plaintiffs answered accepting the proposition, that moment the minds of the parties had met in agreement, and the contract of sale was complete. "The unqualified acceptance by one of the terms proposed by the other, transmitted by due course of mail, is regarded as closing the bargain from the time of the transmission of the acceptance." Tayloe v. Insurance Co., 9 How. 390–402. "The rule of law now is that a contract is completed when its acceptance is forwarded, without reference to the time of its reception." Lungstrass v. Insurance Co., 48 Mo. 201. The same rule applies in this day to correspondence conducted by telegraph. The letter from plaintiffs to defendant of the same date was but a confirmation of their acceptance of the contract, and this letter was presumably received by defendant on July 25th.

This general rule of law is not controverted by defendant's counsel, but their contention in this connection is that the letter of the same date from defendant to plaintiffs put a limitation upon the proposition submitted by telegram, to the effect that, if any of the wheat shipped by him should not grade No. 2, the plaintiffs were not to take it as of the grade fixed by the inspector, but they should turn such shipments over to Fisher. Waiving the question as to whether, after the minds of the parties had met, as evidenced by the telegrams, the

defendant could impose any other conditions upon the contract by a subsequent communication, we are unable to read the letter as construed by the defendant's counsel. The first sentence of the letter shows clearly enough that the defendant had received the plaintiffs' telegram of acceptance, for it says: "We expect you people to give us 10–15 days. But I believe we can make it next week, as we ship three large cars Monday morning,"—which would be July 26th, the day on which he did make the first shipment. And this shows the further fact that he had already consented in his mind to the contract consummated by the telegram and letter of acceptance. He then proceeded to say in this letter that, as the plaintiffs were strangers to him, in case some of the wheat should fail to grade, he wanted them to notify him by wire, as he had "Fisher Com." to look after his business in Kansas City. This language must receive the construction which comports with the plain meaning and common acceptation of such words by two parties situated just as these were. As the wheat was to be inspected by the inspector at Kansas City, who was to fix its grade, and the defendant would not be present, and therefore felt the importance of having some opportunity to look after the grade fixed by the inspector, to have any mistakes or errors therein corrected, and felt unwilling to rely upon the plaintiffs, because of his lack of intimate acquaintanceship with them, the letter merely asked them to notify him by wire if the wheat did not grade up properly; and his reference to "Fisher Com." clearly enough carried with it the impression to plaintiffs that he only expected them to notify him of any grading less than the requirement of the contract, so that he could have Fisher, who looked after his business in Kansas City, to take any steps he might desire to rectify any wrong done him by the inspector. It would be to read into this letter a term, which its language does not naturally import, to construe it unto a direction to turn over to Fisher all the wheat shipped by him which did not grade No. 2 hard. And it is made clear from the plaintiffs' answer to this letter of July 26, 1897, that they understood from his letter that his sole purpose was to have an honest inspection, and that he expressed a reluctance to trust that matter to the plaintiffs solely because they were strangers to him. Accordingly, the plaintiffs wrote him: "We will look very carefully after the grading of your wheat here, and also after the weights." And it is furthermore manifest, from what immediately thereafter followed, that the defendant himself accepted and acted upon this construction placed upon his letter by plaintiffs. In the due course of mail he received plaintiffs' letter of the 26th on the 27th, and on the 28th he made plaintiffs another shipment of several cars, and wrote plaintiffs the following letter:

"Otis, Ks., July 28, 97.

"Andrews Co.
"K. City, Mo.
'Dear Sir:
        "We sheapt you the folowing:
        cars 6874 I M 44000#
        cars 5057 M & P 44000#
        cars 15146 do. 58000#
and mail draft for $775.00 and $500.00 last car.
        "[Signed] L. Schreiber."

And the defendant continued thereafter each day to make shipments to the plaintiffs. The first two or three shipments, perhaps, graded all right, until, on July 31st, the plaintiffs wrote defendant that one car graded No. 3, which was applied on the contract at $1\frac{1}{2}$ cents off. And on July 31st the plaintiffs again advised him of another car received that day which graded No. 3, with a certain discount off. On August 2d plaintiffs notified defendant of the receipt of two other cars that day which graded No. 3. And it was not until August 2, 1897, that the defendant telegraphed to plaintiffs he could not stand one-half off on the car graded 3,—"turn them over to Fisher." This was the first direction and the first intimation the plaintiffs had from the defendant that he wanted them to turn the wheat graded No. 3 over to Fisher. He also wrote them that he could not stand their work; to which plaintiffs replied, in effect, that as he did not say that he would ship No. 2 wheat to replace the stuff which undergraded, and as they were obliged to have wheat to fill their contracts, they did not see how they could turn it over to anybody else, with the further statement:

"We know just what we are talking about when we say we are applying your 3 wheat on the contract as closely as anybody else here can do it. 58-lb. 3 wheat is being applied on the contract at one cent off, and 57-lb. wheat at 2 cents off, and we do not think Mr. Fisher or anybody else could do any better by you. We have nothing whatever to do with the grading of your wheat, but at the same time, when we think the stuff is not properly graded, we always order a reinspection upon it. While you might have had more of the wheat which you shipped to Hall & Robinson grade No. 2 than the wheat you shipped us, it is quite likely that you shipped them better wheat. We have taken no advantage of you whatever, and have applied your wheat in just the same manner that we apply everybody else's."

After the contract for the sale of this wheat was complete, the status of the parties in respect thereto was fixed; and it was not in the power of either party to add new terms or conditions thereto, or to recede therefrom, without the consent or acquiescence of the other. This is so axiomatic as to require no citation of authorities in its support. Moreover, under the contract as made between the parties, and in conformity with the custom in such transactions, as soon as the defendant loaded his wheat on the cars at Otis, Kan., and received the bills of lading, he drew upon the plaintiffs, with the bills attached, for the amount of each separate shipment, and the plaintiffs paid these drafts as they came. But the defendant, in his communication of August 4, 1897, directing the plaintiffs to turn over No. 3 wheat to Fisher, neither proposed to ship them other wheat in its stead, nor to refund the money which he had received from plaintiffs on the shipments, nor does it appear that he ever directed Fisher to pay it, nor did Fisher ever go to the plaintiffs and make any demand on them for the wheat; and while on this trial the defendant offered Fisher to testify that he was willing and able to have taken the wheat and paid the plaintiffs therefor, the rights of the plaintiffs are to be determined in this action by the facts as they existed at the time the controversy arose.

The further contention of defendant is (1) that by the terms of the contract the wheat did not become deliverable to the plaintiffs until after inspection at Kansas City; (2) that this inspector sustained the

relation to the parties similar to that of an arbiter, to determine by his inspection whether or not the wheat shipped came up to the required grade; and, (3) if this inspection was adverse to the shipper, the wheat did not become deliverable under the contract, and the title remained in the shipper, the vendor, and therefore the plaintiffs were guilty of a conversion in failing to turn it over to Fisher upon the defendant's order. In support of this contention, the following cases are cited: Nofsinger v. Ring, 71 Mo. 149.; Chapman v. Railroad Co., 114 Mo. 542, 21 S. W. 858; Frost v. Woodruff, 54 Ill. 155; Martin v. Hurlbut, 9 Minn. 142 (Gil. 132); Dustan v. McAndrew, 44 N. Y. 72; Crane v. Roberts, 5 Me. 419; Benj. Sales, § 870; 2 Schouler, Pers. Prop. § 286.

These cases but assert the proposition, in substance, that where A. agrees to sell B. a given article for future delivery, at a stipulated price, subject to inspection by an inspector selected or agreed upon by the parties, the inspection is a condition precedent to the vesting of the title in the vendee; and that, in the absence of other qualifying provisions, until such inspection is made, title remains in the vendor; and if, on inspection, the article fails to come up to the requirements of the contract, the vendee may refuse to accept it, and the vendor is without cause of complaint. But if such inspector, without fraud, reports that such article tendered complies with the contract, the vendee is concluded thereby; and, if he then refuses to accept and pay, the vendor is entitled to his action as for a breach of the contract. None of the cases, however, hold that if the inspector honestly decides that the article tendered is defective, and the vendee refuses to accept it, he may not, nevertheless, have his right of action against the vendor for damages.

As applied to the facts of this case, the doctrine contended for by defendant's counsel is wholly inapplicable. The rule of law is well established that where goods are bought by a distant merchant, to be delivered by the seller to the carrier at his place of business, and the vendor takes a bill of lading in his own name, and draws upon the consignee for the purchase money, and attaches a draft to the bill of lading, and forwards them to his banker or agent for collection, the property in the goods remains that of the vendor until the draft is honored and paid; but the moment the draft is paid, and the bill of lading is thereupon turned over to the consignee, the possession and right of property are thereby transferred to the purchaser. Fowler v. Treadwell, 13 Fed. 22; Forty Sacks of Wool, 14 Fed. 643; Dows v. Bank, 91 U. S. 618; The Merrimack, 8 Cranch, 317; Benj. Sales (2d Ed.) § 399.

In Erwin v. Harris, 87 Ga. 333, 13 S. E. 513, the rule is thus aptly stated:

"The general rule is that when one orders goods from a distant place to be shipped by a common carrier, and the order is accepted and the goods shipped, the delivery to the common carrier is a delivery to the purchaser, the common carrier being the agent of the purchaser to receive them; and, when this is done, the title, without more, passes from the vendor to the vendee. If, however, the vendor of the goods is not satisfied of the solvency of the purchaser, or is doubtful thereof, or wishes to retain the title in himself, he may vary this rule, when he makes the consignment and delivers the

goods to the carrier, by taking a bill of lading from the carrier to his own order. When the vendor does this, it is evidence that he does not part with the title of the goods shipped, but retains the same until the draft which he sends with the bill of lading is accepted or paid."

See, also, Ramish v. Kirschbraun, 107 Cal. 659, 40 Pac. 1045.

The defendant, as the evidence shows, had for several years been a large shipper of wheat to commission merchants at Kansas City, and was familiar with the usage and custom of the trade at that point. As soon as the wheat was weighed by the railroad company at Otis, Kan., he took bills of lading to himself, and drew upon the plaintiffs for the purchase money, attached the draft to the bill of lading, and forwarded the same to his correspondent at Kansas City for presentation to plaintiffs, which was promptly accepted and paid by plaintiffs before the wheat was inspected and weighed out at Kansas City. The moment the plaintiffs thus accepted and paid the drafts, and received the bills of lading, the delivery to them was completed, and the ownership and the risk changed to the purchaser. The only office of inspection at Kansas City, under such a state of facts, was to determine what was the true grade of the wheat, to prevent disputes thereafter between the shipper and consignees; and, clearly enough, neither party understood that this was essential to the delivery of the property and the passing of the ownership to the purchaser.

In this juncture, what were the rights of the purchaser? Such a contract on the part of the defendant to ship to the plaintiffs No. 2 hard wheat was, in contemplation of law, the same as a sale by sample, and carried with it an implied warranty that the wheat shipped was in accordance with the contract. Zabriskie v. Railroad Co., 131 N. Y. 78, 29 N. E. 1006; 28 Am. & Eng. Enc. Law, p. 775; Hardy v. Fairbanks, James, 432; Winsor v. Lombard, 18 Pick. 59; Hastings v. Lovering, 2 Pick. 214; Hogins v. Plympton, 11 Pick. 97; Bid. War. 97. Any discussion of the question as to whether or not a vendee under a contract of implied warranty on the part of the vendor, upon failure of the article after inspection to comply with the terms of the contract, has a right to return the goods and sue upon the warranty, would be wholly academic, under the facts and situation of this case. See Manufacturing Co. v. Vroman, 35 Mich. 310. Undoubtedly, if the goods had been shipped to be paid for after inspection, and they proved defective by inspection, the purchaser would have had the right to refuse to receive them. And it is equally unquestionable that, under the facts of this case, the plaintiffs had the right to receive the goods, and bring action against the vendor for breach of warranty. Lyon v. Bertram, 20 How. 154; Woodruff v. Graddy, 91 Ga. 333, 17 S. E. 264; 28 Am. & Eng. Enc. Law, 814; Benj. Sales, §§ 894–1348; Day v. Pool, 52 N. Y. 420; Weed v. Dyer, 53 Ark. 155, 13 S. W. 592. The inspection was not a waiver of the warranty. English v. Commission Co., 6 C. C. A. 416, 57 Fed. 451; Gaar v. Patterson, 65 Minn. 451, 68 N. W. 69; Hull v. Belknap, 37 Mich. 179. The English authorities upon this question are very aptly presented in the case of Lewis v. Roundtree, 78 N. C. 323, where it is ruled that an agreement like this amounts to a warranty on the part of the vendor that the goods shipped are of the required quality; and that even where the

purchaser has an opportunity to inspect the goods when delivered, and actually takes them, it does not amount to a waiver of the warranty that they should be of the specific description; and that although he does not return the goods to the vendor, or give notice of their failure to come within the description warranted, he is still entitled to bring an action for breach of the warranty. The plaintiffs, in the case at bar, notified defendant promptly of the undergrades.

The offer of the defendant to show that the plaintiffs realized a profit on the sale of the No. 3 wheat over the contract price for No. 2 wheat is certainly inadmissible. Any advance in the market was the legitimate fruit of the venture, just as the purchaser would have had to bear the loss of any decline in the market price prevailing at the time of delivery. Cordage Co. v. Wohlhuter (Minn.) 74 N. W. 175; J. I. Case Plow Works v. Niles & Scott Co. (Wis.) 63 N. W. 1013; Bach v. Levy, 101 N. Y. 511, 5 N. E. 345; Brown v. Emerson, 66 Mo. App. 63; Medbury v. Watson, 6 Metc. (Mass.) 246; Brown v. Bigelow, 10 Allen, 242; Wheelock v. Berkeley, 138 Ill. 153, 27 N. E. 942.

The result is that the plaintiffs are entitled to recover on the second count of the petition, and the counterclaim pleaded by defendant is denied. Finding and judgment accordingly.