**FARMERS GRAIN, LIVESTOCK AND COOPERATIVE MERCANTILE ASSOCIATION, Inc., a corporation, Plaintiff,**

v.

**COMMODITY CREDIT CORPORATION, a corporate body of the United States of America, Defendant.**

No. KC–297.

United States District Court
D. Kansas.

Nov. 2, 1956.

Blake A. Williamson and A. C. Cooke, of Williamson, Cubbison & Vaughan, Kansas City, Kan., for plaintiff.

G. H. Penstone, Kansas City, Mo., and Milton P. Beach, Asst. U. S. Atty., Kansas City, Kan., for defendant.

MELLOTT, Chief Judge.

By appropriate pleadings, plaintiff, a corporation engaged in operating a public licensed grain warehouse and elevator at Niles, Kansas, sought judgment against the Commodity Credit Corporation for $37,202.62. The issues raised in the pleadings are hereinafter summarized in a memorandum findings of fact and conclusions of law previously entered herein. The memorandum, in-

790

cluding a brief discussion of some of the issues of law, is now set out:

" * * * The amount of $19,128.74 is sought in count one under an alleged 'contract implied in law.' The essence of the charge contained in this count is that some of the wheat, stored commingled in plaintiff's warehouse, had been damaged by flood; that when defendant, responsive to notice from plaintiff, removed good wheat, for which it held warehouse receipts, it thereby secured a more favorable position than it was entitled to; and that it should be 'required to account to the remaining depositors, or their transferees,' and to plaintiff 'acting as trustee,' for the excess received. In count two it is alleged that, subsequent to the flood, defendant, by its conduct, delayed, and failed promptly to effectuate removal of wheat owned by producers and stored under the government price support program, until the wheat had substantially deteriorated; that plaintiff had been 'compelled * * * to buy in the loan status grain from the producer, in order to salvage as much of the value of said grain as possible;' and that plaintiff had thereby sustained a loss of $18,073.88.

"This court has jurisdiction under Title 15 U.S.C.A. § 714b. The case was tried without a jury and the parties have filed suggested findings of fact, conclusions of law and briefs. While the evidence has not been transcribed, the court's recollection of it, refreshed by the suggested findings and exhibits, impels it to make the following:

"Findings of Fact

"1. Plaintiff is a corporation duly organized and existing under the laws of the State of Kansas. At all times here material it was engaged in operating a public licensed grain warehouse and elevator at Niles, Kansas, under the Kansas Warehouse Law (Ch. 34 Gen.Stat. of Kans.1949). Defendant is a body corporate and an agency of the United States, duly created and existing pursuant to authority granted under the 'Commodity Credit Corporation Charter Act,' approv-

ed by Congress, June 30, 1948, as amended. (15 U.S.C.A. § 714 et seq.)

"2. The warehouse and elevator consist of eight cylindrical metal tanks (numbered 19 through 24; see Ex. 1), having capacities for the storage of grain ranging from 14,500 bushels to approximately 28,500 bushels (average, approximately 22,000 bushels), each with a hopper or downspout through which grain passes by gravity onto a conveyor belt in an underground tunnel leading to the headhouse. A superstructure for the movement of grain extends across the tops of the tanks. One similar tank (No. 18) adjoins the headhouse on the other side of it and two smaller ones are located in the headhouse. In addition to these tanks there are 15 circular metal bins, each with a capacity of approximately 2,500 bushels, into and from which grain can be moved by portable augers or 'bazookas.' The total capacity of all the tanks is approximately 250,000 bushels.

"3. Commodity Credit Corporation (hereinafter Commodity) and Production and Marketing Administration (hereinafter P. M. A.) were, at all times material here, closely interrelated organizations of the United States Government and jointly charged with the responsibility of carrying out the price support and loan program under the Agricultural Adjustment Act of 1938 and amendments. P. M. A. initially approved all loans on grain stored in government approved elevators, prepared notes secured by warehouse receipts from producers and forwarded copies or originals of all such documents to Commodity, which, at that time, would either advance actual funds for loans or guarantee loans by approved banks.

"4. The Government price support program, during the periods material here, was carried out substantially as follows:

"a. The producer deposited his grain in a warehouse and obtained a warehouse receipt indicating its quantity and grade.

"b. The producer then took the warehouse receipt to the P. M. A. office of the county in which the wheat was produced,

obtained approval of his eligibility for a price support loan, and executed a loan agreement and note payable to a bank of his choice. The approved note and loan agreement, together with the warehouse receipt, was then delivered to the bank and the amount of the price support loan was disbursed by the bank to the producer.

"c. The original of the note and loan agreement and the warehouse receipt were retained by the payee bank. One copy of the note and loan agreement was transmitted to Commodity's office in Kansas City, Missouri; one copy was sent to the P. M. A. county office; and one copy was retained by the producer.

"d. The payee banks had the right, under the Lending Agency Agreements, to accept payment of such loans and return the warehouse receipts to the producers. They also had the right to tender the notes to Commodity for purchase at any time, and Commodity had the right to require the payee banks to tender the notes to it for purchase. In case the notes were purchased from banks by Commodity, the original notes and loan agreements and attached warehouse receipts were delivered to Commodity and placed in its vault. They were indexed only by county and loan number.

"e. The maturity date of the loans was usually April 30 following the wheat harvest. Those for the 1951 wheat crop involved in this proceeding matured April 30, 1952.

"f. Under the terms of the note and loan agreements the holders of the producers' notes were required, in the absence of fraud, to look solely to the pledged grain for satisfaction of the notes. However, under the applicable regulations issued by the Secretary of the Department of Agriculture and published in the Federal Register, the producers had the privilege, at any time, of obtaining the release of the grain, pledged as collateral security for such notes and loan agreements, by paying to the holders the principal amounts of the loans plus charges and accrued interest. The producers were thereby assured of receiving

at least the loan rate for their wheat inasmuch as if the price of wheat went down, they could liquidate the loans by surrendering the wheat. On the other hand, if the price of wheat went up, they could receive the benefit of the price increase by paying off the loans in cash and redeeming their wheat, in which event they would then be in a position to sell it to whomsoever they desired.

"5. On or about July 1, 1950, plaintiff and Commodity entered into a 'Uniform Grain Storage Agreement,' specifying the terms and conditions under which plaintiff would store grain for Commodity and also providing that, insofar as the relations between them were concerned, such contract would be applicable to grain deposited in plaintiff's warehouse by producers and pledged as collateral, either to Commodity or to local banks, as security for loans under Government price support programs. Commodity had in storage at the time of the happening of the incident giving rise to the present controversy, under this contract, 64,604.30 bushels of the 1950 wheat crop, commingled, of which it had become the owner under the plan of operation outlined in the preceding finding.

"6. On September 4, 1951, and thereafter until September 18, 1951, there was in storage at plaintiff's elevator, in addition to the 64,604.30 bushels of the 1950 crop which were owned by Commodity, 63,136.10 bushels owned by various producers, pledged to local banks as security for price support loans, and 42,293.10 bushels evidenced by warehouse receipts held by various individual owners or on open storage scale tickets. Between August 24, 1951 and November 9, 1951, Commodity acquired, through local banks, warehouse receipts covering 25,200.67 bushels of the wheat in the second category above (i. e. of the 63,136.10 bushels). None of the notes, loan agreements or warehouse receipts pertaining to the balance of the wheat in the second category was acquired by Commodity from the banks until after November 27, 1951.

"7. During the summer of 1951 there were heavy rains and intermittent floods,

some of which inundated the Solomon River valley in the vicinity of Niles, Kansas. The Solomon rose above flood stage on seven occasions, reaching approximately the following peaks on the dates indicated: May 23, negligible; May 28, 3 feet; June 14, 5 feet; June 28, 6 feet; July 13, 7 feet; July 28, 2 feet; and September 5, 4 feet. At the time of the high water on July 13–14, the ground around the elevator was partially covered by water and the ground water table rose to unusual heights. On August 14, 1951, the walls of the tunnel under two or three of the tanks adjoining the headhouse (i. e. Nos. 19, 20 and 21) collapsed. The collapse rendered the underground conveyor system inoperative and impeded the handling of grain. Plaintiff, by means of pumps, was successful in keeping the tunnel from flooding until September 4, 1951, at which time the flood water rose above the conveyor belt in the tunnel to an undetermined height.

"8. The collapse of the tunnel did not directly cause any loss of, or damage to, any appreciable quantity of grain. However, inasmuch as the pumps were not being operated, it is probable the water came into contact with some portion of the hoppers or downspouts of the tanks and a small quantity of the grain in them.

"9. Between September 5, 1951 and September 11, 1951, officers of the plaintiff and agents of Commodity had numerous conversations, personally and over the telephone, regarding the conditions at plaintiff's elevator and the advisability of removing the grain was discussed. On September 11, 1951 plaintiff sent a telegram to Commodity which, exclusive of salutation, address and signature, is as follows:

" 'Referring to telephone conversation with Mr. Hughes this morning we herewith notify you that approximately 41,000 bushels of 1950 crop wheat owned by Commodity on warehouse receipts issued by the Farmers Grain Livestock Co., Niles, Kansas, Code 8–4063 is in immediate danger of going out of condition some spots showing 25pct td sample

grade. This elevator has sustained considerable damage in the recent flood and water in the pit and tanks necessitate large scale repairs. We are making arrangements for official inspections and await your instructions for shipping orders immediately. Please advise'

"10. The Uniform Grain Storage Agreement dated July 1, 1950 provided, *inter alia*:

" 'With respect to the grain stored commingled, the warehouseman shall at all times maintain in the warehouse indicated on the warehouse receipts and in which the grain was originally deposited for storage a stock of grain of the quantity, class, grade, and quality which he is obligated to deliver under the warehouse receipts. * * *

" 'The warehouseman, at his own expense, shall take all necessary steps to keep all of the grain which is stored in the warehouse, whether commingled or identity preserved, from going out of condition, and shall condition any such grain which is out of condition or is in danger of becoming so, to the extent that the warehouse is equipped to do so. The warehouseman shall promptly notify Commodity if any of the grain requires drying, and if authorized by Commodity, shall promptly dry the grain if the warehouse is equipped with drying facilities, payment therefor to be made at a rate agreed to by Commodity and the warehouseman or, if no rate is agreed to, at the warehouseman's customary rate, except that no payment shall be made for drying which is necessitated by negligence on the part of the warehouseman. If after the exercise of such care in receiving, storing, and conditioning of such grain as a reasonably prudent owner thereof would exercise, deterioration cannot be prevented by conditioning as determined by an inspection at the expense of the warehouseman (such inspection to be performed by an inspector li-

censed under the United States Grain Standards Act or by an inspector agreed upon promptly by the warehouseman and Commodity) the warehouseman shall immediately notify Commodity of such fact, if the warehouse receipts held by Commodity are the oldest outstanding receipts representing the commingled grain which is out of condition, or in danger of becoming so, or if such grain is stored identity preserved under this agreement, and shall dispose of, or care for, such grain at the expense of and in accordance with the directions of Commodity. Unless the warehouseman fails to exercise due care or fails to comply with the directions of Commodity, he shall be liable for deterioration in the quality of such grain which is determined to be out of condition or in danger of becoming so only until the date he notifies Commodity or the date such inspection is performed, whichever is later. * * *.

" 'The warehouseman shall have fulfilled his obligation to notify Commodity as required in this agreement *only* when such notice is received *in writing* by the Director, PMA Commodity Office, in the area in which the warehouse is located.' (The words italicized are so shown in the signed contract, Ex. 15).

"11. During the summer of 1951, plaintiff had received at its elevator large quantities of wheat, part of which it purchased and part of which it received for storage. It advertised that it would buy wet wheat and did buy wet and damaged wheat, some of which was sample grade wheat, at prices considerably below the market price for good wheat. It did not ship out any sample grade wheat from its elevator until after September 11, 1951. Part, or all of such grain (after such conditioning and drying as plaintiff was able to give it) was commingled with the grain already in the elevator.

"12. On or shortly after September 5, 1951 plaintiff took samples drawn from tanks No. 21 and No. 22, which tested as shown in the first two lines of the table below. Plaintiff continued to turn the wheat in these and other tanks. On September 12, 1951 Commodity sent an agent of the county P. M. A. to make an inspection of the grain and the warehouse. He and an assistant manager of plaintiff took representative samples of grain from tanks No. 21 and No. 20, the latter apparently being (although the court cannot specifically so find) a tank into which some of the grain had been put as part of the turning operation. The samples referred to above were tested by the Kansas Grain Inspection Department and showed the conditions indicated in the last two lines of the table below.

| Date Inspected | Bin No. | Kind & Grade | Wt. per bu. | Total Damage | Remarks (Condition) |
|---|---|---|---|---|---|
| Sep. 8 | #21 | Sample | 57.4 | 25% | Musty |
| Sep. 10 | #22 | " | 58 | 20% | " |
| Sep. 12 | #21 | #2 Hard | 59.1 | 4% | (Blank) |
| Sep. 12 | #20 | #3 Hard | 59.1 | 6% | (Blank) |

"13. On September 17, 1951 Commodity issued a loading order for the removal of the 64,604.47 bushels of wheat owned by it. The order gave plaintiff until October 17, 1951 to complete shipment of the grain, on which date storage charges were to end. At the request of plaintiff it was given an additional two weeks to complete those shipments.

"14. On September 20, 1951 Commodity had one of its agents from Kansas City inspect plaintiff's warehouse. He drew samples from tanks containing approximately a total of 80,000 bushels

and concluded that of that quantity approximately 12,000 bushels were sample grade, that some of the remainder showed grade 5 or better and that the wheat in four of the bins showed bran bug infestation. Apparently no inspection was made at that time of the other wheat in the elevator.

"15. Between September 17, 1951 and October 29, 1951, Commodity received shipments of wheat aggregating 63,677.18 bushels, leaving 927.30 bushels of its 64,604.30 which, being less than a carload, had not been shipped. Part of the grain when received by Commodity was damaged, weevily, and musty, and the grain was worth less than the grain called for by the warehouse receipts. In settlement with plaintiff, Commodity set-off against storage charges the sums of $7,146.92 for quality deterioration and $2,040.80 for quantity shortage.

"16. Between October 19, 1951 and November 27, 1951, officers of plaintiff consulted with agents of Commodity regarding the advisability of removing the grain owned by various producers and to which the notes, loan agreements, and warehouse receipts were held partly by local banks, and partly by Commodity. Plaintiff, at that time, also advised the Kansas Grain Inspection Department of the conditions at the warehouse.

"17. On November 27, 1951 plaintiff furnished Commodity a list of all its outstanding warehouse receipt holders, advising Commodity by letter that it would be unable to prevent further deterioration of the grain, and requesting that Commodity notify the holders of the warehouse receipts of such fact. Plaintiff also sent copies of the letter to the Kansas Warehouse Department and the State office of P. M. A.

"18. After receipt of the letter referred to in the preceding finding, Commodity caused additional samples of the wheat to be taken and tested by the Kansas Grain Inspection Department which showed:

| Date Inspected | Bin No. | Kind & Grade | Wt. per bu. | Total Damage | Remarks (Condition) |
|---|---|---|---|---|---|
| Nov. 29 | #25 | #5 Hdw. | 57 | 12% | (Blank) |
| Nov. 29 | #12 | Sample | 57.2 | 36% | Musty |
| Nov. 28 | #10 | Sample | 54.7 | 18% | Musty |
| Nov. 29 | #14 | Sample | 55 | 50% | Musty |
| Nov. 28 | #13 | Sample | 55.7 | 36% | Musty |
| Nov. 28 | #8 | Sample | 55.5 | 16% | Musty |
| Nov. 28 | #6 | Sample | 57.3 | 18% | (Blank) |
| Nov. 28 | #2 | #4 Hdw. | 54.3 | 10% | (Blank) |
| Nov. 28 | #11 | Sample | 54.7 | 26% | Musty |
| Nov. 28 | #5 | #3 Hdw. | 56 | (Blank) | (Blank) |
| Nov. 28 | #23 | #3 Hdw. | 56 | (Blank) | (Blank) |
| Nov. 28 | #1 | Sample | 55.7 | 36% | Musty |
| Nov. 28 | #20 | Sample | 55 | 35% | Musty |
| Nov. 28 | ##6&9 | #4 Hdw. | 55.7 | (Blank) | (Blank) |
| Nov. 29 | #15 | #4 Hdw. | 54.5 | 7% | (Blank) |
| Nov. 29 | #22 | Sample | 55 | 22% | Musty |
| Nov. 29 | #13 | Sample | 53.3 | 18% | Musty |
| Nov. 29 | #21 | #4 Hdw. | 55.2 | 4% | (Blank) |
| Nov. 29 | #26 | #5 Hdw. | 59 | 15% | (Blank) |
| Nov. 29 | #18 | Sample | 57.2 | 20% | Musty |
| Nov. 29 | #24 | Sample | 56 | 98% | Musty |

"19. Responsive to plaintiff's letter of November 27, referred to in Finding No. 17, Commodity, on or about December 3, 1951 notified the producers of the grain that because of the flood damage at the elevator and the inability of the plaintiff

to prevent deterioration of the wheat it was necessary the producers either pay off the loans within 5 days, or suffer Commodity to take possession of the wheat represented by the loans. Commodity advised the producers that because of the rise in grain prices it would be to their advantage to pay the loans and sell the wheat.

"20. Subsequent to the notice referred to in the preceding finding, plaintiff purchased all of the pledged wheat offered to it at the current market price for grain of the grade and quality specified in the warehouse receipts. It was not required by law or contract to purchase the wheat at the prevailing market price for good wheat; but it did so to promote good will with its customers even though some of the wheat was damaged. Most of the wheat referred to in this finding was acquired by plaintiff during the early part of December, 1951, at which time the market price for wheat was at the highest point during the period between July 1, 1951 and July 1, 1952.

"21. Plaintiff, in an effort to minimize its losses, also bought good wheat and mixed it with the deteriorated wheat in proportions deemed by it to be advantageous. This process continued through December, 1951 and the first four months of 1952, by which time most of the wheat in the warehouse, including the deteriorated wheat which plaintiff had acquired from producers in December of 1951 and the good wheat subsequently acquired, had all been shipped out of its warehouse.

"22. The mixture resulting from the blending referred to in the last two findings was sold by plaintiff at a loss; but it cannot be determined from the evidence the grades of the deteriorated wheat at the time it was blended with the good wheat and shipped out, nor whether the good wheat received into the warehouse had deteriorated before it was mixed with the deteriorated wheat. While it is possible to determine, on the date of the sales, the value of the mixture, it is impossible to determine the value of the respective quantities of new and old wheat which had been combined to create the mixture. It is likewise impossible to determine what proportion of the deterioration of the old wheat took place while the defendant was a co-owner of substantial quantities of wheat in the warehouse and how much took place after the delivery to Commodity of the 63,677.18 bushels of the 1950 wheat.

"Conclusions of Law

"1. The rights and duties of the parties in respect to the grain involved in this controversy are governed by the terms of the Uniform Grain Storage Agreement dated July 1, 1950.[1]

"2. The evidence does not disclose the extent of the damage to the grain attributable to flood waters and the grain must be considered to be out of condition grain rather than damaged by flood.

"3. Plaintiff, contrary to the terms of the Uniform Grain Storage Agreement (Finding No. 10), failed to take all necessary steps to keep the grain from going out of condition.

"4. Commodity acted reasonably promptly in ordering its grain out of the warehouse after it had received written notice on September 11, 1951, that, as holder of the oldest outstanding warehouse receipts, its grain had been dam-

"1. '21. Terms of Agreement to Prevail —The terms of this agreement including the Schedule of Rates shall prevail over the written or printed terms of the warehouse receipts representing the grain, and over State and local regulatory laws and rules to the extent that such laws or rules may be inconsistent herewith. This agreement shall supersede any existing Uniform Grain Storage Agreement between the warehouseman and the Secretary of Agriculture or Commodity, as of the last annual renewal date of such agreement, except that charges with respect to services performed under any such prior agreement shall be paid in accordance with the terms of such prior agreement and the storage charges under this agreement shall not begin to accrue until the expiration of any free time to which the holder of any warehouse receipt is entitled under the terms of any such prior agreement.' "

aged and was in immediate danger of going out of condition.

"5. In respect to the grain owned by Commodity on September 4, 1951, the grain was delivered and settlement was made in accordance with the terms of the agreement, and plaintiff is not entitled to recover any portion of the loss occasioned by the grain going out of condition.

"6. In respect to the grain owned by various producers on September 4, 1951 and pledged as security for loans under the price support program, Commodity had authority to move the grain in order to protect its security; but it owed no duty to plaintiff to exercise control until it had received written notice as provided by the agreement that the grain was going out of condition.

"7. Commodity acted reasonably promptly in calling the loans to effectuate removal of the last mentioned grain after it had received written notice on November 27, 1951 that the grain was out of condition and that plaintiff would be unable to prevent its further deterioration.

"8. As to the last mentioned grain, Commodity owed no duty to the pledgors until it had actual notice that their equitable interests were threatened and, in any event, plaintiff could not, after failing to keep the grain in condition as required by the agreement, acquire by purchase the rights of the pledgors against Commodity if any such rights had arisen.

"9. Plaintiff is not entitled to recover from Commodity any portion of the loss suffered by it in respect to the out-of-condition grain purchased from the various producers.

"10. Without deciding whether the doctrine of estoppel is available against Commodity to avoid the terms of an agreement such as the one involved herein, the court concludes that the conduct of Commodity's agents was not so misleading in relation to plaintiff's actions as to raise an estoppel under the circumstances here present.

"Discussion

"The findings which have been made and the conclusions which have been reached are dispositive of all the issues. The plaintiff predicates its right to recover upon two theories: First, that the flood proximately caused the loss by directly damaging the grain, by damaging the warehouse and its equipment to an extent that the grain could not be conditioned or loaded out properly, and, by disrupting rail transportation, rendered impossible expeditious removal of the grain to other locations. It is therefore claimed that Commodity, as a tenant in common of the commingled grain, should bear a proportionate share of the loss. Secondly, that the agents or officers of Commodity, by a course of conduct consisting of false promises, assurances, and advice, communicated orally by telephone or in personal interviews, upon which plaintiff relied, and by failure to act upon oral information supplied by plaintiff or actual knowledge of the danger to the grain, caused delay in its removal which resulted in all of the grain going out of condition and comprised such misconduct as to estop Commodity from insisting upon a compliance with the terms of the agreement.

"In respect to the first, it cannot be found that the flood was the proximate cause of the loss. It is probable that the several high waters, occurring at or near plaintiff's warehouse, in conjunction with excessive rainfall and generally humid conditions, made it difficult to keep the grain in condition. Some direct damage may have been caused to the grain by contact with the flood waters; but it has not been established what portion of the loss, if any, was so caused and what portion subsequently ensued through failure to remove the grain or condition it. Flour Mills of America v. Burrus Mills [2] is authority for the proposition that the owners of commingled grain share proportionately a loss caused by flood; but

"2. 174 Kan. 709, 258 P.2d 341."

that decision is bottomed on facts essentially different from those present here. In that case, the warehouse had been inundated to a depth of approximately twenty feet and a large quantity of yellow milo in storage had been submerged. In the instant case, whether the flood waters reached any of the grain was a contested issue. It cannot be decided on surmise or conjecture; and there is no positive evidence the water ever reached any of the grain. Two purportedly representative samples, drawn from the tanks directly over the collapsed portion of the tunnel on September 12, 1951, some six or seven days after the last flood peak, revealed the grain to be in relatively good condition. The tests showed a moisture content of 13.5% and 13.6%, respectively, for the samples, which is not indicative that flood waters had reached the grain. The rules applicable to out-of-condition grain, rather than flood damaged grain, appear to the court to be applicable.

"The present facts are more nearly comparable to those in St. Paul Mercury Indemnity Co. v. United States [3] where the court found the deterioration to have been caused by certain negligent acts of omission by the warehouseman. The plaintiff, in this case, contends that the flood created conditions made proper conditioning of the grain impossible. In that connection it may be noted that the agreement made provision for a course of conduct to be followed if and when plaintiff found itself unable to prevent the grain from deteriorating by conditioning, which brings us to the second theory espoused by plaintiff.

■ "The agreement provided that the plaintiff should give Commodity written notice whenever any of the grain became out of condition if plaintiff, by conditioning, could not prevent further deterioration. Plaintiff contends it advised Commodity of the threatened danger to its grain by the routine and customary means of communication used in business, that is, by telephone, and that it relied upon the advice and instructions given by agents of Commodity during the course of the conversations. There is a dispute as to the content and context of the conversations—witnesses for the respective parties presented conflicting testimony—and there is no preponderance of the evidence in favor of either version. The most that is revealed is that Commodity had knowledge of a possibility of damage to its grain stored in plaintiff's warehouse. The written notice required by the agreement was not forthcoming until September 11, some five or six days after the last flood peak and nearly a month after collapse of the tunnel had made inoperable the underground conveyor belt used in conditioning the grain. Assuming, without specifically so ruling, that estoppel could be raised against Commodity, it does not appear that plaintiff has presented a justifiable cause for avoiding the requirements of the agreement. A reasonably prudent and cautious man would, and should, have taken measures to ascertain the extent of the damage immediately and would have availed himself of the provision of his agreement to escape liability for further deterioration and loss. Unless he failed to exercise due care or failed to comply with the directions of Commodity he would be liable for deterioration of the grain owned by Commodity only until the date he gave the requisite written notice or the date Commodity caused an inspection to be made, whichever event occurred last. As to this plaintiff, it may be that Commodity erred in setting off against storage charges the amount of loss caused by deterioration which occurred after its inspection of September 12, 1951. However, no specific claim has been presented under this provision of the agreement so it is passed.

■ "What has been stated in reference to the grain owned by Commodity on September 4, 1951 is equally applicable to the grain owned on that date by various producers and pledged as security for loans under the price support program. Commodity owed no duty to plaintiff to call the loans or to move the

"3. 10 Cir., 201 F.2d 57."

grain until it had received written notice that further deterioration of the grain could not be prevented. Until receipt of such notice, Commodity had a right to assume that plaintiff wished to continue storage of the grain for the benefit to be derived from the storage charges and that it would condition the grain, if necessary, in accordance with the terms of the agreement. Plaintiff delayed until November 27, 1951 giving the requisite notice, by which time most of the deterioration had already occurred, as is indicated by the reports of the inspection made by Commodity on November 28, 1951. Plaintiff has failed to establish that it is entitled to recover damages under either theory.

"The conclusions reached make any extended discussion of plaintiff's rights and duties as a public warehouseman under the decisions and statutes of the State of Kansas nugatory. However, a few general statements may not be amiss in view of the contentions advanced by plaintiff in its briefs.

 "It is apparently settled law in Kansas that a warehouseman is not an insurer[4] although, as a bailee for hire, he may increase his liability even to that extent by express agreement.[5] He is required by G.S.Kan. (1949) 34–263 to exercise reasonable care to protect and preserve property entrusted to him for safekeeping. If he is unable to deliver the goods on demand, he is required by 34–250 *idem* to show a lawful excuse; and the burden is upon him, where the goods are damaged or destroyed, to acquit himself of negligence and to show a lawful excuse for failure to deliver.[6] If commingled grain becomes out of condition, he is required by G.S.Kan. (1949) 34–273 to give notice of the fact to the holders of the oldest outstanding warehouse receipts representing such grain and to the Kansas Grain Inspection Department. Plaintiff, incidentally, did not comply with the provisions of the latter statute. In the light of the statutory requirements, as interpreted by the decisions, it is doubtful if plaintiff would be entitled to recover, even if Commodity were estopped to rely upon the agreement.

"The court is of the opinion and now holds that a general judgment must be entered in favor of the defendant. Such judgment should be prepared by counsel for the prevailing party and settled in accordance with the Federal Rules of Civil Procedure, 28 U.S.C.A., and this court's rules of practice."

Within due time after the entry of a general judgment in favor of the defendant as directed in the above memorandum, a motion for a new trial was filed by the plaintiff, which following argument was granted upon one facet of the controversy, viz., whether deterioration of the grain owned by Commodity and in storage in the warehouse had occurred after notice had been given by the warehouseman as provided in its contract with Commodity. This concerns some 64,600[7] bushels of the 1950 wheat crop stored commingled, a written notice having been given by the warehouseman on September 11, 1951 with respect to 41,-000 bushels of that wheat (Finding No. 9). The provision of the applicable Uniform Grain Storage Agreement is shown in Finding No. 10.

The portion of the contract provision particularly applicable here is the last sentence quoted in Finding No. 10. Under it the warehouseman is liable for deterioration in the quality of grain "only until the time he notifies Commodity (September 11, 1951) or the date such inspection is performed (September 12,

"4. Wiley v. Locke, 81 Kan. 143, 105 P. 11, 24 L.R.A.,N.S., 1117."

"5. Sturm v. Boker, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093; Sun Printing & Publishing Ass'n v. Moore, 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366."

"6. Wiley v. Locke, supra; Caldwell v. Skinner, 100 Kan. 567, 164 P. 1166, affirmed 105 Kan. 32, 181 P. 568; Denning Warehouse Co. v. Widener, 10 Cir., 172 F.2d 910, 13 A.L.R.2d 669. Cf. Flour Mills of America v. Burrus Mills, supra."

7. The exact figure is 64,604.30 as shown in Finding No. 5; but throughout this discussion it will be referred to as 64,-600.

1951)" unless he has failed to exercise due care or to comply with the directions of Commodity.

Following the hearing of additional evidence, the court felt it was justified in finding, and it now does find, that on September 12, 1951 the 64,600 bushels of wheat were in a satisfactory condition and no substantial deterioration in the grain, as called for in the warehouse receipts, had occurred; that the notice given by the plaintiff, as set out in Finding No. 9, was sufficient notice under the agreement; that plaintiff promptly complied with the load order given by Commodity and, without negligence, removed Commodity's grain, which subsequent to September 12 had deteriorated; and that plaintiff had not failed to exercise due care pertaining to said grain or to comply with the directions of Commodity. The court also felt it was justified in finding, and it now finds, that the 64,600 bushels of grain owned by Commodity and subject to the provisions of the Uniform Grain Storage Agreement before it had been removed from the warehouse had deteriorated in the total amount of $7,095.24; that the deterioration occurred proportionately and it is fair, equitable, reasonable and just and in accordance with the terms and conditions of the Uniform Grain Storage Agreement that Commodity be held liable for deterioration in the quality of the 41,000 bushels of grain referred to in the written notice given to Commodity on September 12, 1951; that even though the remainder of the grain was moved with the consent of Commodity and under its instructions subsequent to September 12, 1951 without any further written notice from the warehouseman, approximately 23,600 bushels of the 64,600 bushels of grain had not been included in the written notice which had been given on September 11, 1951, referred to above. The court therefore finds that it would be inequitable, unfair, unreasonable and unjust and not in accordance with the terms and conditions of the Uniform Grain Storage Agreement to charge Commodity with any portion of the deterioration in the 23,600 bushels of wheat.

The court has therefore on this phase of the controversy concluded and now holds that Commodity should stand 410/-646 or 63.4% of the aggregate deterioration of $7,095.24, from which it follows that a judgment should be entered in favor of the plaintiff and against Commodity for the amount of $4,498.38. Appropriate form of judgment should therefore be prepared by the parties for that amount and settled in accordance with the Federal Rules of Civil Procedure and the local Rules of Practice.

Additional discussion of the applicable legal principles need not be undertaken. While other cases have arisen in this and other courts involving the construction of contracts between Commodity and warehousemen, decision in them turned, not so much upon the construction of the contracts as upon the question whether the necessary notice had been given, whether the "load-out" order had been complied with promptly, or whether the deterioration, which had thereafter occurred, had resulted from the negligence of the warehouseman. The instant case is distinguishable upon its facts; and, while it may have been somewhat unusual for the court, in effect, to have permitted the parties to adduce evidence at the limited re-trial which probably should have been presented earlier, the court is convinced the later findings are justified and that its present conclusion is just and correct. The judgment last indicated above is therefore being entered.