WESTERN SURETY COMPANY, a Corporation, and Essex Grain Company, a Corporation, Appellants,

v.

REDMAN RICE MILLS, INC., Appellee.

WESTERN SURETY COMPANY, a Corporation, and Essex Grain Company, a Corporation, Appellants,

v.

KAPLAN RICE MILLS, INC., Appellee.

Nos. 16243, 16244.

United States Court of Appeals Eighth Circuit.

Nov. 24, 1959.

Girardeau, Mo. and Robert A. Dempster, Sikeston, Mo., were with him on the brief), for appellants.

Joe Welborn, Bloomfield, Mo. (Briney & Welborn, Bloomfield, Mo., and Blanton & Blanton, Sikeston, Mo., were on the brief), for appellees.

Before WOODROUGH and MATTHES, Circuit Judges, and MICKELSON, District Judge.

MATTHES, Circuit Judge.

These cases were consolidated and tried to the court without a jury. They were likewise heard together on appeal. In case No. 16,243 judgment was rendered in favor of Redman Rice Mills, Inc. (Redman) against Essex Grain Company (Essex) and Western Surety Company (Western) for $5,388.57. In case No. 16,244 judgment was rendered in favor of Kaplan Rice Mills, Inc. (Kaplan) and against Essex and Western for $6,650.35. Essex and Western have appealed. We have jurisdiction because of diversity of citizenship and amount involved.

Portions of the evidence are common to both cases, parts thereof relate only to the Redman case, No. 16,243, while other parts are relevant only to the Kaplan case, No. 16,244.

Essex maintained and operated a public warehouse for the storage of grain at Essex, Missouri. Its storage facilities consisted of eight large metal tanks. On February 25, 1955, Essex and Commodity Credit Corporation, referred to hereinafter as "Commodity", entered into a written contract designated in the record as Uniform Rice Storage Agreement (URSA) under the terms of which Essex agreed to receive, handle, condition, warehouse, store and load out rough rice on behalf of Commodity. The agreement is lengthy and consists of 20 printed pages of the record. Pertinent portions thereof will be discussed and considered as we proceed.

Under the contract, upon receipt of rice for storage, Essex was required to promptly issue negotiable warehouse

Gerald B. Rowan, Cape Girardeau, Mo. (Oliver & Oliver, Allen L. Oliver, Cape

receipts with certain information designated thereon, such as whether the rice was stored "identity preserved," or "modified commingled." Pursuant to another provision of the contract, Essex furnished a "Warehouseman's Bond" with appellant Western as surety thereon. Under this bond Essex and Western were held and firmly bound unto Commodity and to any person injured by a breach of the URSA in the principal sum of $20,000. Said bond was in full force and effect at all times during which the rice involved was stored in the Essex warehouse. Section 10(c) of the URSA relates to "identity preserved" rice and provides:

"It shall be the responsibility of the warehouseman to take such action as may be necessary to promptly determine when the rice stored identity preserved is in need of conditioning and he shall immediately notify the owner thereof. If Commodity is the owner of such rice, the warehouseman shall care for, condition, or dispose of such rice at the expense of and in accordance with the directions of Commodity. If such rice is not owned by Commodity and the owner will not agree to incur the cost of conditioning, the warehouseman shall immediately notify Commodity by telegram or letter. The liability of the warehouseman with respect to identity preserved rice shall be as provided in section 13(e)."

Section 13(e) of the URSA referred to in Section 10(c) is as follows:

"In the case of rice stored identity preserved, the warehouseman shall not be liable for shortage or shrinkage in weight or for deficiencies in the quality of the rice unless such shortage or shrinkage in weight or deficiencies in quality result from his failure to use due care, his failure to provide appropriate warehousing services, his failure to deliver the rice as directed by Commodity and in accordance with the representation as to loading out capacity made in his 'Application for Approval,' or his failure to give such notice (as provided in section 10(c)) that the rice was in need of conditioning as a prudent warehouseman would have given. The warehouseman shall be liable and shall pay Commodity in cash for any shortage or shrinkage in weight or deficiencies in quality which result from any such failure on his part. If such rice is commingled with other rice, or if the identical rice received by the warehouseman is not delivered, the warehouseman's liability shall be as provided with respect to rice stored commingled."

Prior to its experience with the rice in question, Essex had not stored or handled such grain in its storage facilities. In March and April, 1955, the rice was delivered to Essex. During the week of May 16, 1955, it was officially inspected and graded by a representative of the United States Rice Inspection Office, who issued an official certificate showing the grade, milling yield and moisture content of the rice. (At the time official grading certificates were issued, portions of the official samples were set aside in lard cans, properly identified by warehouse receipt numbers). Thereafter, and on the basis of the report of the official inspector, Essex issued 5 negotiable warehouse receipts numbered 41, 42, 43, 44 and 45. Each receipt represented the rice stored in a particular storage tank and provided that upon surrender thereof, properly endorsed, Essex would deliver the rice "to order of Commodity Credit Corporation." Upon the face of each receipt was a notice that it was issued and delivered subject to all the terms of the URSA. All of the rice here in question was stored "identity preserved" and this was reflected upon the negotiable

warehouse receipts. The following table reveals the data and information recorded upon and forming a part of each receipt:

| Receipt No. | Weight | Variety | Grade | Milling Yield | Moisture Content |
|---|---|---|---|---|---|
| 41 | 6645.10 cwt | Zenith | U.S. #2 Rough Rice | 51%–65% | 14.0% |
| 42 | 6650.00 cwt | " | " | 35%–67% | 12.4% |
| 43 | 9084.40 cwt | " | U.S. #1 Rough Rice | 48%–66% | 13.3% |
| 44 | 6428.10 cwt | " | U.S. #3 Rough Rice | 46%–64% | 13.7% |
| 45 | 8908.40 cwt | " | " | 47%–64% | 14.0% |

Six grades were established for the rice in question—1 to 6, with No. 1 being the best rice. If the rice could not qualify for grade 6 it was placed in "Sample" grade.

From time to time Commodity published "schedules," offering for sale warehouse receipts representing stored rice. The schedules listed the warehouse receipt numbers, how and where stored, pound quantity, grade, variety and milling yield. The schedules pertinent here disclosed that warehouse receipt No. 41 represented Lot No. 6783; warehouse receipts Nos. 42 and 43 represented Lot No. 6516 and warehouse receipts Nos. 44 and 45 represented Lot No. 6517. The price at which Commodity was willing to sell was designated in the schedules. Additionally, Commodity indicated the amount of *milled rice*, grade 5 or better, that it would repurchase from the successful bidders. The price of the rough rice thus being set, the prospective purchasers or millers then made bids by stating the price at which they would re-sell the milled rice to Commodity. In this connection, plaintiff Redman was the successful bidder for warehouse receipt No. 41, or Lot No. 6783; and plaintiff Kaplan made two separate and successful bids, one on warehouse receipts Nos. 42 and 43 which made up Lot No. 6516, and one on warehouse receipts Nos. 44 and 45 which made up Lot No. 6517. After the bids were accepted, the negotiable warehouse receipts were duly endorsed by Commodity and delivered to the purchasers thereof.

Accompanying the Commodity schedules was an announcement, setting out the terms of sale and re-purchase, and advising that official samples were available from the warehouseman, or that, upon request, new samples might be drawn. The announcement further provided that Commodity made no warranty as to the grade, weight or milling yield of any of the depth of the rough rice covered by the warehouse receipts.

Apparently it was the custom in the trade for millers to obtain samples of the rice before bidding on it. Accordingly, a Mr. Lammers, buyer for Redman, visited the Essex Grain Company and obtained official samples, taken from the portions in the lard cans set aside for that purpose. These samples were then forwarded to Redman for testing at its mill. In the case of Kaplan, Mr. Gilbert of that office telephoned and requested that official samples be mailed to them at Kaplan, Louisiana. In response to this request, samples were taken by Essex from the lard cans and mailed to Kaplan. These official samples, taken at the time warehouse receipts were issued, of course matched the description of the rice as it appeared on the receipts and Commodity schedules. In neither instance were current samples requested or drawn from the storage bins. Upon the basis

of tests made from these official samples, Kaplan and Redman made their bids which were accepted by Commodity.

On or about August 6, 1955, Essex was ordered to ship the rice represented by warehouse receipt No. 41, and shortly thereafter Essex loaded, sealed and shipped 11 railroad car loads of rice to Redman. At about the time the orders for shipping were given, Lammers, representing Redman, telephoned to inquire as to when the Redman rice would be loaded, and requested that samples be held out for his inspection. The next day he appeared at the Essex storage bins, found that the cars had gone, but was given bags containing samples which had been taken from each car as it was loaded. He made tests of these samples on the spot and ascertained that the rice as shipped was far inferior in quality to the grades specified in the warehouse receipt purchased by Redman. Lammers had obtained the samples from "Slim" Eaton, the employee of Essex who was in charge of the loading, and when Lammers observed the inferior quality of the rice and the fact that it was stack burned, he called it to Eaton's attention, and asked him as to the possible cause. "* * * and I asked him if he had turned the rice, and he (Eaton) told me that they were so full they couldn't turn anything, and every bin in the place was full, of not rice altogether, but wheat, barley and so forth, grain, and it was impossible for them to turn it." Mr. Eaton denied making such statement. Lammers forwarded the samples taken from the cars to the Redman mill for inspection, and Redman in turn contacted the United States Rice Inspection Office, which sent its representative to make official tests of the rice, which was still sealed in the railroad cars. The official inspector broke the seals and tested and graded the rice in each car. These tests revealed that the rice in 6 of the 11 cars was damaged and had deteriorated in quality to such an extent that it was impossible for Redman to comply with its contract with Commodity. Five of the 6 cars of damaged rice tested at sample grade, and the other tested at grade 5.

As to the warehouse receipts purchased by Kaplan, Essex was directed on or about July 28, 1955, to ship the rice represented thereby, and shortly thereafter loaded, sealed and shipped the rice to Kaplan. In Lot No. 6517 represented by warehouse receipts Nos. 44 and 45, there was a total of 24 railroad car loads. The procedure followed with respect to the Kaplan rice differed in that there was an official inspection and grading of the rice at Essex, Missouri, at the time the rice was loaded and sealed. This inspection revealed that the rice in 18 of the 24 cars, covered by warehouse receipts Nos. 44 and 45, had deteriorated in quality to such an extent that it could not be used by Kaplan in performing its contract with Commodity.

By reason of the poor quality of the rice as received, Redman and Kaplan were unable to deliver quantities of milled rice to Commodity as contemplated; there was no domestic market for sample grade rice, much of which was unfit for human consumption, and in order to dispose of it, Redman and Kaplan were required to add good rice, and give it special treatment in order to sell it on the Puerto Rican market.

Further facts, particularly with respect to the care used by Essex in caring for the rice will be developed in the course of this opinion.

The major or basic point stressed by appellants is that *"there was no evidence* that defendant (Essex) *was guilty of negligence* in any respect in the performance of its duties under the Uniform Rice Storage Agreement."

■ We preface our discussion of this contention with the observation that these cases were tried to the court without a jury. This brings into play Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A., which provides that "(f)indings of fact shall not be set aside unless clearly erroneous, and due

regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Recently, in Nelson v. Seaboard Surety Co., 8 Cir., 269 F.2d 882, 886, this court again had occasion to give effect to the rule in this language:

"The findings of fact of a trial judge sitting without a jury should not be set aside unless it is clearly demonstrated that they are without adequate evidentiary support in the record or were induced by an erroneous view of the law. Pacific National Fire Ins. Co. v. Mickelson, 8 Cir., 235 F.2d 425, 428; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 138."

Pertinent here are these findings of the trial court made in each case:

"The damage to said rice was caused from heat and was caused by the defendant Essex Grain Company negligently failing to use due care in caring for said rice and in negligently failing to provide appropriate warehousing services.

"The defendant Essex Grain Company negligently failed to determine that said rice was in need of conditioning and negligently failed to inform or notify the Commodity Credit Corporation of the fact that said rice was deteriorating and in need of conditioning."

Missouri has adopted the Uniform Warehouse Receipts Act (U.W.R.A.), V.A.M.S., §§ 406.010 to 406.560. Section 406.030 specifies the information that must be embodied within the terms of a warehouse receipt, and § 406.040 provides that a warehouseman may insert other terms and conditions in a receipt, provided that such terms and conditions shall not:

"(1) Be contrary to the provisions of this chapter;

"(2) Nor in any wise impair his obligation to exercise that degree of care in the safekeeping of the goods entrusted to him which a reasonably careful man would exercise in regard to similar goods of his own."

Under § 406.090 [§ 8 U.W.R.A.] of the Missouri Act, a warehouseman, in the absence of some lawful excuse is bound to deliver the goods upon demand by the holder of the receipt issued therefor; and in case of a failure or refusal to deliver, "the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal." Section 406.210 [§ 21 U.W.R.A.] deals with the duty to care for goods and provides the warehouseman shall be liable "for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care."

The foregoing statutes received careful and exhaustive consideration by the Supreme Court of Missouri, in Brown v. Sloan's Moving & Storage Co., 274 S.W.2d 310, 296 S.W.2d 20. On the first appeal, 274 S.W.2d at page 315, in resolving the question of the burden of proof, or, as stated by the court, "the risk of nonpersuasion," regardless of the form of action, contract, or negligence, the court stated: "We believe the plain language of the Act (§§ 406.-090, 406.210) puts the burden of proof on the issue (negligence) squarely upon defendant, who, because he had custody of the property and the control of the premises where the property was stored and destroyed, usually has the better means of ascertaining the facts and circumstances of the loss, knows the precautions he had taken to guard against it, and is therefore the better able to sustain the burden." See also, Hoerath v. Sloan's Moving & Storage Co., Mo., 305 S.W.2d 418, and cases cited § 21 U.W.R.A.; 3 U.L.A. § 21, note 100, pp. 112–114.

■ The instant warehouse receipts expressly provide that they were issued subject to the terms and provisions of the rice storage agreement. We do not regard the agreement as impairing the statutory obligation of Essex with respect to the stored property; therefore, the contract controls. See and cf. Farmers Grain, etc., Ass'n v. Commodity Credit Corp., D.C., 145 F. Supp. 788, 795.[1] Although this action is premised upon a breach of the contract, fundamentally, the issue is whether the rice deteriorated in quality as the result of the failure of Essex to exercise due care, as a warehouseman, in caring for the property. If so, Essex was guilty of negligence which in turn furnished the basis for breach of the provisions of the contract contained in sections 10(c) and 13(e), supra. Thus, it is clear that the teachings of the Missouri Supreme Court in Brown, supra, are controlling.

■ On the issue of liability the trial judge had for consideration evidence tending to prove that the storage of rice under normal conditions is not without difficulty; that on account of the high moisture content of the instant 1954 rice crop it was particularly troublesome from a storage standpoint. Mr. Simpson, a witness for defendants, expert in the business of storing rice, stated—"my experience was it was a pretty hard year, pretty bad year.—I mean we had to turn it and watch it more." There was testimony given by the manager of Redman, which also stored rice, that his company followed the practice of turning stored rice every 10 days. Simpson was of the opinion that good warehousing practice required that rice be turned once every month, that it be aerated on dry days, and that the aeration fans be run two or three hours a week if the rice is keeping all right; that through the process of coring the bin the rice should be tested twice or three times monthly. It is not clear whether the good warehousing practices referred to by Mr. Simpson related to a normal crop or the 1954 crop, which everyone agreed presented more problems. At any rate, Mr. Lumsden, manager for Essex, testified that the rice in question was turned the week of May 16, 1955, at which time it was officially inspected and graded; it was turned the week of June 13, and again the third and final time during the week of July 11. He also stated the aeration fans were run frequently on dry days; that on various occasions samples were taken from each tank to check the condition of the grain and that at no time did he find excessive moisture or excessive heat, or that the rice was deteriorating in quality. But then the trial judge also had before him the testimony of Lammers that "Slim" Eaton had stated the rice was never turned. Additionally, other witnesses stated that Essex had on occasions operated the aeration fans at night when the humidity was higher. This was not considered good practice. There was also for consideration the fact that Essex was inexperienced in storing rice, and that metal bins are more likely to sweat and cause moisture to accumulate than wood tanks. Although defendants are prolix in suggesting possible causes for the deterioration of the rice, they failed to come forward with any proof to substantiate their theories. From the foregoing résumé, it is clear to us that the trial court, being in a position to judge and pass upon the credibility of the witnesses, was fully warranted in finding that Essex failed to exercise due care in discharging the obligation imposed upon it and that such failure was the proximate cause of the damage to and deterioration of the rice

---

1. The warehouseman may bind himself to a higher duty by contract, and may stand as an insurer. See Michigan Fire & Marine Ins. Co. v. National Surety Corp., 8 Cir., 156 F.2d 329, 331; Farmers Grain, Etc., Ass'n, supra, 145 F.Supp. at page 798; and cf. Engel v. Cord Moving and Storage Co., Mo.App., St. Louis, 313 S.W.2d 173.

■ We come to defendants' next contention, as to failure of proof of damages. By order of the trial court, this issue was re-opened and the parties submitted additional evidence and written briefs directed to this point. In the main, this additional evidence consisted of the deposition of Mr. George Jacobs, marketing specialist for the United States Department of Agriculture, whose duties included determining cash market prices for the Director of the CSS Commodity office on rice. Defendants complain of several factors and circumstances entering into the computation of the damages arrived at by the trial court.

Initially, as to the Redman rice, defendants object to the fact that there was no official sampling at the time this rice was loaded at Essex, Missouri, for shipment to Redman and that there was no proper showing of the condition of the rice when loaded at Essex. Section 12 of the URSA provides:

> "12. Determination of Weights and Grades on Load Out—The class, grade, quality and quantity of all the rice loaded out by the warehouseman shall be determined on the basis of official weights and official grades at the warehouse location, *or if official weights or official grades are not available at such point, on the basis of official weights and/or official grades at destination.* Such official grades shall be determined on the basis of samples taken by an official sampler as the rice is loaded out or arrives at destination." (Emphasis added.)

Apparently there was no official sampler located at Essex, Missouri. In the case of the Kaplan rice, two inspectors from the Department of Agriculture at Jonesboro, Arkansas, made official inspections as the Kaplan rice was loaded. As to the Redman rice, it is conceded that Mr. Lammers was not an official inspector and that the Redman rice was not officially inspected until it arrived at its destination. However, in view of Mr. Lammers' testimony of the inferior grade of the rice held out for his inspection at the time it was loaded, the fact that the cars were inspected immediately upon their arrival at the Redman mill, with the official inspectors breaking the seals on the cars at that time; and in the absence of any probative evidence indicating that the rice could in some way spoil during its journey from Essex, Missouri, to Mermentau, Louisiana, there is no basis for inferring that the inspection certificates issued in Louisiana did not properly reflect the grade and condition of the rice when it was delivered to the carrier in Essex, Missouri.

■ Defendants next complain that plaintiffs failed to prove the amount of their damages "as required by the contract," although pointing to no specific provision of the URSA. However, Section 13(b) provides:

> "In making settlement for the rice delivered by the warehouseman * * * values * * * shall be determined on the basis of cash market prices as determined by the Director of the CSS Commodity Office as of the date the final shipment under the applicable order to load out is accepted by the carrier."

Section 13(e) relating to rice stored identity preserved, provides in part:

> "The warehouseman shall be liable and shall pay Commodity in cash for any shortage or shrinkage in weight or deficiencies in quality which result from any such failure [to use due care] on his part."

As otherwise stated by plaintiffs, "the measure of damages in this case is the difference between the reasonable market value of the goods before the damage and after the damage." In this regard, plaintiffs presented the testimony of Mr. Jacobs, the marketing specialist, which established official market values of the rice, as graded, upon the date the warehouse receipts were issued. Mr. Jacobs then testified as to market values of the rice as actually delivered in the damaged cars, with the excep-

tion of those cars which graded "sample." He testified that inasmuch as "sample" grade could range from nearly a No. 6 grade, to absolute "junk," it was impossible to fix a value on sample grade rice without actually inspecting it. In arriving at damages, the trial court used Mr. Jacobs' testimony as to values, and supplemented it with the testimony of the managers of Redman and Kaplan as to the value they placed upon the sample grade rice as received by them. In addition to objecting to the use of "non-official" values, defendants also complain that the market value of the rice *at Essex, Missouri,* was not satisfactorily established. Testimony indicated that in fact, absent near-by mills, there was no market for rice at Essex, Missouri, and the market values given tended to be for those markets nearer the rice mills of plaintiffs; however, witnesses indicated that the values testified to would apply to Essex, Missouri, when proper adjustments for freight were made.

■■ The rules of evidence concerning proof of market value tend to be lenient, especially when there is no market for the commodity at the place of inquiry. 31 C.J.S. Evidence § 183(e), p. 901, states: "Where it appears that no market value for a commodity exists at the place involved * * * market value at other places may be shown, if these are sufficiently near to show, in connection with cost of transportation, etc., the value at the place in question * * *" See Rosenblatt v. Winstanley, Mo.App., K.C.Ct.App., 186 S. W. 542, 543; Hard & Rand v. Biston Coffee Co., 8 Cir., 41 F.2d 625, 627. See also, 31 C.J.S. Evidence § 181; 93 C.J.S. Warehousemen & Safe Depositaries § 83(b). Here, defendants failed to offer any counter evidence indicating a market value for the rice at Essex, Missouri. As to the fact that the contractual provisions for determining values failed, as to the sample grade rice, i. e., that Mr. Jacobs, who determined market prices for the Director of the CSS Commodity office, was unable to

set a price on sample grade rice, and in the absence of any counter evidence offered by defendants, the trial court was entitled to use the best evidence available in setting a market value upon this sample grade. As stated in Security Stove & Mfg. Co. v. American Ry. Express Co. (K.C.Ct.App.), 227 Mo.App. 175, 51 S.W.2d 572, 577:

" '* * * there being no other element of certainty by which the damages can be *accurately* measured, resort must be had to such principle or basis of calculation applicable to the circumstances of the case (if any be discoverable) as will be most likely to *approximate* certainty, and which may serve as a guide in making the most probable estimate of which the nature of the case will admit; and, though it may be less certain as a scale of measurement, yet if the principle be just in itself, and more likely to approximate the *actual damages,* it is better than any rule, however certain, which must certainly produce injustice, by excluding a large portion of the damages actually sustained.' "

See also and cf. Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 263–266, 66 S.Ct. 574, 90 L.Ed. 652. Our analysis of the record on this question satisfies us that there was ample support for the trial court's finding as to the amount of loss sustained by plaintiffs.

■ As to the Kaplan grain, one final contention of defendants remains. It will be remembered that Kaplan made two separate bids,—one covering receipts Nos. 42 and 43 for Lot No. 6516, the other covering receipts Nos. 44 and 45 for Lot No. 6517, and that damage was confined to rice shipped upon receipts Nos. 44 and 45 for Lot No. 6517. Defendants offered testimony indicating that Kaplan received *better* rice than called for under receipts Nos. 42 and 43 for Lot No. 6516, and defendants therefore claim that they are entitled to an offset by reason of the increased value—in other words, they

claim to be entitled to offset their liability for Lot No. 6517 by the increased valuation of Lot No. 6516 which was not involved in Kaplan's claim. This contention is entirely without merit; separate bids were submitted on these two lots; separate prices were paid; they were in all respects separate purchases. Furthermore, Mr. Jacobs testified that in making settlements under the URSA, warehousemen are never given credit for rice that turns out to be better than that called for by the warehouse receipt. See Andrews v. Schreiber, C.C.W.D.Mo., 93 F. 367, affirmed Schreiber v. Andrews, 8 Cir., 101 F. 763.

From the foregoing it is manifest that appellants have failed to demonstrate that the findings of fact were without adequate evidentiary support in the record or were induced by an erroneous view of the law, and, accordingly, the judgment in each case is

Affirmed.