**CRUMP et al. v. THOMPSON.**

No. 13715.

United States Court of Appeals
Eighth Circuit.

Dec. 23, 1948.

---

George K. Cracraft and George K. Cracraft, Jr., both of Helena, Ark., for appellants.

C. E. Daggett, of Marianna, Ark. (Daggett & Daggett and Jimason J. Daggett, all of Marianna, Ark., on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and COLLET, Circuit Judges.

THOMAS, Circuit Judge.

This is an appeal by the plaintiffs from a judgment for the defendant in an action against the trustee in bankruptcy of the Missouri Pacific Railroad Company to recover the value of two carloads of cotton destroyed by fire.

The case was tried to the court without a jury, and the plaintiff assails as erroneous certain findings of fact, a ruling of the court refusing to reopen the case to receive further evidence, and the court's conclusion of law.

In the trial court plaintiffs claimed that they had loaded two cars of the defendant with baled cotton for shipment; that the cotton was delivered to and accepted by the defendant as a common carrier; that while the cars were still standing on the defendant's sidetrack they were destroyed by fire through no fault of plaintiffs; and that the obligation of the defendant as a common carrier was that of an insurer, therefore judgment for the value of the cotton was demanded. The defendant denied delivery and acceptance of the cotton for shipment, alleging that an embargo in existence at the time prevented a delivery; that even if there were a delivery defendant was not liable by reason of certain exceptions in the bill of lading.

The evidentiary facts have been agreed to in part and are stated in part in the findings of the court. The plaintiffs are engaged in the production of cotton and other farm commodities upon a plantation located near Crumrod, Arkansas. As an incident of their business they operate a public cotton gin located near one of the defendant's lines of railroad, which runs between Helena, Arkansas, and McGehee, Arkansas, Crumrod being within a radius of 100 (exactly 98.7) miles short railroad

traffic route distance from Memphis, Tennessee.

Defendant's train No. 394-395 was operated as a local freight train in October and November, 1944, between Lexa, Arkansas, and McGehee, Arkansas. On regular schedule it left Lexa at or about 7:00 A.M. on Mondays, Wednesdays and Fridays, southbound to McGehee, and on Tuesdays, Thursdays and Saturdays it left McGehee about 7:00 A.M., northbound to Lexa.

The defendant maintains no agent at Crumrod, but does furnish a sidetrack or spur adjacent to the cotton gin through which facilities the plaintiffs ship a large amount of cotton and cotton seed during the cotton season.

An established custom existed at Crumrod for many years prior to 1944 and still continues between the plaintiffs and the defendant with reference to the delivery of cotton and cotton seed to the defendant. That custom is for the defendant to supply the plaintiffs with Uniform Bills of Lading blanks for the purpose of filling in the name of the consignor, the consignee, the bale number of the cotton and the car initials and number. The plaintiffs then notify the defendant that they need certain cars and thereupon the defendant places them on the sidetrack at a point where the cotton or cotton seed can be loaded. The plaintiffs load the cars so placed on the sidetrack, fill out the bill of lading on the form furnished by the defendant in the manner indicated, seal the car and place the bill of lading in duplicate in a box known as the conductor's box in plain view of the main railroad line placing a red flag over the box. This gives notice to the defendant that the cars are loaded and ready for shipment. Thereupon the conductor operating the train on the next northbound trip signs the bills of lading, replaces them in the receptacle provided therefor, and subsequently moves the cotton under the bills of lading so executed.

On October 21, 1944, Dabney Crump, one of the plaintiffs, called the Memphis Compress & Storage Company by telephone for the purpose of determining whether they would accept two cars of baled cotton. Advised that they would do so, plaintiffs, on October 22, 1944, requested the defendant to furnish two cars for the loading of baled cotton. The order was accepted and on October 23d two cars were placed on the sidetrack at the gin. Following the procedure outlined above, one of the cars was loaded the same day, was sealed and a uniform bill of lading, filled out on a form furnished by the defendant, was placed in the conductor's box with a red flag over the box where it could be plainly seen from the main railroad line. On October 26th the second car was loaded in the same manner as the first car. Verbatim copies of these bills of lading were received in evidence.

On October 28, 1944, when the cars had not been moved, the plaintiffs advised the conductor of a northbound freight train that the cars were still on the sidetrack, although the Memphis Compress & Storage Company had agreed to receive them. The conductor then advised the plaintiffs that he could not move the cars because of an embargo placed against all shipments of cotton consigned to the Memphis Compress & Storage Company on October 18, 1944, prior to the ordering of the cars by plaintiffs. This fact, however, was unknown to plaintiffs until the information was given them by the conductor on October 28th.

On November 2, 1944, the Interstate Commerce Commission issued Service Order No. 249, effective at 12:01 A.M., November 6, 1944, restricting the shipment of all cotton into Memphis, but providing that "The provisions of this order shall not apply to shipments of cotton loaded or in transit prior to the effective date of this order."

Subsequent to November 6, 1944, the effective date of Service Order 249, an agent of plaintiffs again requested the conductor of defendant's freight train to accept the two carloads of cotton and place them in transit, and the conductor expressly refused to accept the cotton or to place it in transit.

On November 15, 1944, a fire occurred which destroyed both the cotton and the cars on which it was loaded. The situation existing at the gin yard and the circumstances connected with the fire, as shown

by the evidence, are stated concisely in the findings of the court, as follows:

"XVII. Prior to and on the date of the fire * * * plaintiffs maintained an unprotected motes, hull and refuse pile on their gin yard, at a point approximately 140 feet distant from the cotton platform located on the spur, or switch, track. As the motes, hull and refuse pile accumulated, it was the practice and custom of plaintiffs, at frequent intervals, to destroy it by fire in order to prevent excessive accumulation. The motes, hull and refuse pile was on fire and burning immediately prior to the time at which the conflagration occurred. It had not been the practice of plaintiffs to in any wise protect the burning motes, hull and refuse pile.

"Immediately prior to the conflagration, there were approximately 650 bales of cotton on the ground and cotton-loading platform which was situate on and between the cotton loading platform and the hull and waste-pile. The bales of cotton on the ground and loading platform had been cut, or sliced at the customary place thereon for sampling purposes, thereby leaving an exposed place on each side of the bales of cotton, approximately 15 to 18 inches in width and 2½ to 3 feet in length. The wind was then blowing from the motes, hull and refuse pile in the direction of the bales of cotton situate on the ground and loading platform; that is, from the West to the East. The fire was transmitted from the unprotected motes, hull and refuse pile to the bales of cotton on the gin yard, and thereafter quickly spread to, and consumed, the two loads of cotton here involved, then situate on the spur track adjacent to the cotton platform. The court expressly finds that such existent condition created and constituted an extremely hazardous fire risk, which was obviously apparent, or should have been apparent, to plaintiffs, and which, in the exercise of reasonable care and precaution, plaintiffs should have avoided. The court further finds that defendant was not in any manner connected with, or responsible for, the origin or subsequent spread of the fire.

"There is no evidence in the record as to how the fire which was burning in the motes, hull and refuse pile immediately prior to the destruction of the cotton, originated.

"XVII-A. Neither defendant, nor any of his agents, had any actual knowledge of the hazardous condition created by plaintiffs, as set out in Finding Number XVII. There is no evidence sufficient to charge defendant, or any of his agents, with constructive knowledge of such hazardous condition so created by plaintiffs.

"XVII-B. Finding of Fact No. XVII is based upon an hypothesis that the cotton herein involved had been delivered to, and accepted by, defendant. Such delivery and acceptance is presumed for the sole purpose of enabling the Court to consider the question of plaintiff's negligence and has not been found as a fact."

Upon the basis of these findings the court concluded:

"In the operation of their gin without adequate safeguards or protective devices to prevent the spread of fire from the motes, hull and refuse pile; and in the storage of baled cotton in the immediate vicinity thereof, in the manner stated in Findings of Fact Number XVII, plaintiffs were negligent, and such negligence on their part was the proximate cause of the fire which destroyed the cotton. The cotton having been destroyed by the negligence of plaintiffs, defendant is not liable therefor."

If the theory upon which the court dismissed the complaint is supported by evidence and is sound as a matter of law it will be unnecessary to consider the further contentions of the plaintiffs.

It will be observed that the court made no finding that the cotton had been delivered to and accepted for shipment by the defendant. Such delivery and acceptance are presumed for the purpose of determining the issue of negligence. The obligation of the defendant as a common carrier depended upon the existence of this fact; but the liabilities and responsibilities of the parties, the one as a shipper and the other as a carrier, were determinable by the provisions of the Uniform Bill of Lading.

■ Since the enactment of the Carmack Amendment (June 29, 1906) to the

Hepburn Act (49 U.S.C.A. § 20), the respective and mutual obligations of the parties are subject to federal law and not to the varying requirements of state laws. Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314, 44 L.R.A., N.S., 257; Atchison, Topeka & Santa Fe Ry. Co. v. Harold, 241 U.S. 371, 378, 36 S.Ct. 665, 60 L.Ed. 1050; Georgia, Florida & Alabama Ry Co. v. Blish Milling Co., 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948; St. Louis, I. M. & So. Ry. Co. v. Starbird, 243 U.S. 592, 37 S.Ct. 462, 61 L.Ed. 917; Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983.

The exception in the bill of lading which the defendant asserts, under the assumed facts, relieves him of liability for the loss of the cotton is

"Sec. 1(b) No carrier or party in possession of all or any of the property herein described shall be liable * * * for any loss thereof or damage thereto or delay caused by * * * the act or default of the shipper or owner, * * *"

Plaintiffs first assail the finding of the court on the ground that its phraseology indicates that the court inferred that it was dangerous to burn the motes and hull pile on the premises and the court conjectured that since the fire started in said motes pile the plaintiffs' acts caused the fire. This construction of the findings was first presented to the trial court by a petition to introduce further evidence, the denial of which is assigned as error. The additional evidence set out in affidavits was intended to show that the motes and hull pile had not been burned by plaintiffs or any of their agents for a long time prior to November 15th, the date of the fire, and that their acts in that regard had nothing to do with the particular fire in question. We do not think the court's findings are open to attack on this ground. The court found specifically that "There is no evidence in the record as to how the fire which was burning in the motes, hull and refuse pile immediately prior to the destruction of the cotton, originated." Further, in ruling on the motion, the court stated "the evidence showed that the fire started in the motes pile and spread over the approximately 700 bales of cotton on the ground to the railroad track and destroyed plaintiffs' cotton, and that the failure of plaintiffs to protect the mote pile so that the fire therein would not spread, coupled with the congested condition of the cotton bales on the ground, all of which had been cut into and sampled, and the loose cotton on the ground, constituted a fire trap, and that if such had not existed, the fire would not have occurred."

■ The finding of the court is clear, and the plaintiffs suffered no prejudice from the denial of their petition to introduce further evidence. The evidence offered did not assume to explain how the fire started in the motes pile, but only to show that plaintiffs did not start it.

The plaintiffs next contend that the defendant is liable for the loss of the cotton under the undisputed facts, even assuming (a) the fault of the shipper within the meaning of section 1(b) of the bill of lading, and also assuming, as did the court, that (b) the cotton involved had been delivered to and accepted by the defendant.

This contention is based upon the theory that the burden was upon the carrier defendant to prove that the loss of the cotton arose solely from the negligence of the plaintiffs and that he failed to sustain such burden because he was guilty of concurrent negligence without which the loss would not have occurred. The rule relied upon is stated in Lehigh Valley R. Co. v. State of Russia, 2 Cir., 21 F.2d. 396, 405,[1] as follows: "The burden was upon the carrier to prove that the loss or damage arose solely from one or more of the excepted causes, and it is of no avail to it to show that the shipper was in any way negligent,

---

[1] Plaintiffs rely also upon St. Louis, San Francisco Ry. Co. v. Ozark White Lime Co., 177 Ark. 1018, 9 S.W.2d 17; Chicago & E. I. R. Co. v. Collins Produce Co., 249 U.S. 186, 39 S.Ct. 189, 63 L.Ed. 552; Saliba v. New York Central R. Co., 101 Vt. 427, 144 A. 194; De Vita v. Payne, 149 Minn. 405, 184 N.W. 184; Dugdale Packing Co. v. Lowden, Mo.App., 160 S.W.2d 832; Toledo & O. C. Ry. v. S. J. Kibler & Bros. Co., 97 Ohio St. 262, 119 N.E. 733, certiorari denied 248 U.S. 569, 39 S.Ct. 10, 63 L. Ed. 425, and other cases of like import.

if the loss or damage would not have occurred, except for the concurring fault of the carrier." In that case the loss resulted from the explosion of ammunition delivered to and accepted for transportation by the carrier. As in the instant case, that was a suit by the owner against the carrier for breach of its common law liability as an insurer. Applying that rule here, the question for determination is whether the loss of the cotton was in some degree the proximate result of some legally concurring "fault" of the defendant carrier.

· The "concurring fault" relied upon is the alleged delay in moving the cars from the sidetrack where they were loaded for a period of nine days from November 6th to November 15, 1944, when the defendant was not prevented from moving them by an embargo or otherwise and during which time defendant allegedly had knowledge of the fire hazard existing at the gin.

The facts claimed to sustain this contention are that the cotton was loaded into the cars and "presumed" to have been delivered and accepted not later than November 6, 1944. The trial court found that the embargo on cotton shipments into Memphis remained in force only until November 6, 1944, and was then superseded by Service Order No. 249 of the Interstate Commerce Commission, which specifically exempted shipments of cotton already loaded into cars. The fire which destroyed the cotton did not occur until November 15th. Therefore, contend the plaintiffs, there was negligence on the part of the defendant in the delay for the intervening period of nine days, and such delay was a concurrent cause of the loss of the cotton.

Under federal law the mere delay of a carrier to furnish transportation according to the terms of a bill of lading is not a cause of loss or damage to a shipment occurring before the transportation begins. St. Louis, I. M. & So. Ry. Co. v. Commercial Union Ins. Co., 139 U.S. 223, 11 S.Ct. 554, 35 L.Ed. 154; Thomas v. Lancaster Mills, 7 Cir., 71 F. 481. Failure to transport with reasonable dispatch under ordinary circumstances is only a breach of the contract of carriage, and the carrier is liable for such damages only as would, in the usual and ordinary course of things, result from such failure to perform, such as difference in the price of the commodity at the place of shipment and at destination and the cost of transportation. Gardner v. Mid-Continent Grain Co., 8 Cir., 168 F.2d 819.

Under section 1(b) of the bill of lading the defendant had no liability for loss of the cotton "caused by * * * the act of the shipper or owner." Lever Bros. Co. v. Baltimore & O. R. Co., 4 Cir., 164 F.2d 738; Alabama & V. R. Co. v. American Cotton Oil Co., 5 Cir., 249 F. 308; Blytheville Cotton Oil Co. v. Kurn, 6 Cir., 155 F. 2d 467.

We conclude that the delay in transporting the cotton was not of itself a concurring cause of the destruction of the cotton under federal law. There is a further rule of law, however, which the plaintiffs contend is applicable to the situation. It is that where a carrier has notice of a dangerous situation liable in the natural course of events in case of delay to result in loss or damage to the shipment, the carrier is liable for such loss upon failure to act promptly. See Gardner v. Mid-Continent Grain Co., supra, and authorities cited; Thomas v. Lancaster Mills, 7 Cir., 71 F. 481, 485. Although it is not claimed that plaintiffs at any time notified the defendant that a hazardous fire trap existed and that unless the two cars of cotton were moved they might be destroyed by fire, it is argued that if such a condition did exist it was known to the defendant during the whole period of delay. Upon this point the court found "There is no evidence sufficient to charge defendant, or any of his agents, with constructive knowledge of such hazardous condition so created by plaintiffs." This finding, plaintiffs claim, is refuted by the testimony of defendant's roadmaster, V. R. Cason, who testified that he passed the gin three or four times a week regularly; that he had observed the hull and refuse pile which was blown out from the gin and that he had noticed that plaintiffs burned the pile from time to time to keep it from accumulating; that he had ob-

served "quite a bit" of lint scattered around the yard and "quite a bit" of bales of cotton on the yard.

Mr. Cason's observations are not specific with reference to the proximity of the time when he observed the cotton bales on the ground to the date of the fire. This is important because the court did not find that the burning of the motes pile constituted the negligence which caused the fire in question, although the knowledge of plaintiffs that the motes pile was inflammable was an element. The motes pile had been burned at intervals for a long time without causing a destructive fire. The negligence found by the court to be the cause of the loss consisted of the custom of burning the motes pile without the use of any protective device and in the placing of cotton bales opened for inspection on the yard between the motes pile and the cars loaded with cotton bales.

The information, not covered by the testimony of Mr. Cason, was supplied by the testimony of Mr. Dabney Crump, one of the plaintiffs. He testified that the fire originated either in the gin and was blown out to the waste pile or in the waste pile and that it thereafter spread over the yard; that the hull and motes pile was in no way protected at that time; that some gins have contrivances or apparatus for the protection of motes piles and some do not. He further testified that in the usual course of ginning plaintiffs ordinarily put the cotton bales as they come out of the gin on a platform. In order to take care of the insurance clause the platform is located 100 feet away, "but *at this time* we were very congested and we put it on the yard * * *. On the afternoon of the fire we had in the neighborhood of seven hundred sampled bales of cotton in the cars, on the ground and everything. The fire spread from the point of origin on the waste pile to the cotton on the yard to the bales on the platform and then caught the cars afire adjacent to it." (Emphasis supplied.)

Plaintiff Crump by his own testimony thus disclosed that he knew that the sampled cotton bales created a fire hazard requiring a safety zone around them 100 feet in width, but "at this time" because of the congested condition at the gin he assumed the risk of placing them on the yard adjacent to the loaded cars and extending to the inflammable motes pile 140 feet distant. There is no evidence that Cason or any other agent of the defendant knew or was acquainted with this situation. In the absence of the cotton bales on the yard, the burning of the motes pile at a distance of 140 feet from the cars would not apparently, as shown by experience, have put the loaded cars on the side track in jeopardy even without a protective device. But the absence of any protective device at the motes pile plus the presence of the cotton bales on the yard created the hazard found by the court to be the cause of the loss.

The testimony of Mr. Cason and that of Mr. Crump taken together presents a picture which amply supports the findings of the court.

█ The record abundantly supports the finding and conclusion of the court that the immediate, active and sole cause of the burning of the cotton involved was an act of the plaintiffs within the meaning of section 1(b) of the bill of lading. It is unnecessary, therefore, to consider the remaining contentions of the parties.

Accordingly the judgment appealed from is affirmed.