323 F.2d 903
 MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILROAD COMPANY, Appellant,
v.
METAL-MATIC, INC., Appellee.
METAL-MATIC, INC., Appellant,
v.
MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILROAD COMPANY, Appellee.
 Nos. 17038, 17039.
 United States Court of Appeals,
Eighth Circuit.
 Oct. 23, 1963.
 
 Benedict Deinard, Minneapolis, Minn., for the Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. Edward M. Glennon, Minneapolis, Minn., was with him on the brief.
 Robert J. King, Minneapolis, Minn., for Metal-Matic, Inc. Clarence O. Holten and James S. Eriksson, Minneapolis, Minn., were with him on the brief.
 Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.
 RIDGE, Circuit Judge.
 
 
 1
 Number 17038 is an appeal from a judgment for damages to goods transported in interstate commerce under a 'straight bill of lading,' containing a 'shipper's load and count' clause. 49 U.S.C.A. 101. Plaintiff, the consignee of the shipment, based its cause of action against defendant under the Carmack Amendment, 49 U.S.C.A. 20(11). Jurisdiction on appeal is premised in 28 U.S.C.A. 1337. We shall refer to the parties as they appeared in the trial court.
 
 
 2
 The Carmack Amendment, supra, is a codification of the common-law requirement holding interstate common carriers liable for goods damaged or lost in transport without proof of negligence. Under that Act, the initial carrier is made liable for damage to property carried in interstate commerce under through bill of lading whether in its possession or that of a connecting carrier. The delivering carrier is made equally liable. Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 (1911); Cincinnati, New Orleans & Tex. Pac. Ry. Co. v. Rankin, 241 U.S. 319, 36 S.Ct. 555, 60 L.Ed. 1022 (1916). The action here is against the delivering carrier.[1] A justiciable issue of fact is established in an action such as this when plaintiff shows that its goods were delivered in good condition to the initial carrier and they arrived in damaged condition. Galveston, H. & S.A. Ry. Co. v. Wallace, 223 U.S. 481, 32 S.Ct. 205, 56 L.Ed. 516 (1912). Then the carrier sued has the burden to establish that the damage was solely occasioned by an Act of God, the public enemy, the inherent vice or nature of the commodity, or an act of the shipper. (Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913); Boston & Maine Rd. v. Hooker, 233 U.S. 97, 34 S.Ct. 526, 58 L.Ed. 868 (1914)). If true, the carrier is relieved of liability. Secretary of Agriculture v. United States, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173 (1956).
 
 
 3
 The material facts in the case at bar, for the most part established by deposition testimony, are not substantially in dispute. Plaintiff, a Minnesota corporation, purchased some heavy machinery from Houdaille Industries, Inc., of Buffalo, New York. Included in the purchase was an Etna Tube Mill which was comprised of twenty-five sections. The purchase price for the machine included a specified amount for preparing it for shipping and loading into railroad cars. Pursuant to that agreement, the shipper, Houdaille, prepared the property for shipment and loaded it into boxcars at its siding in Buffalo, New York. Two boxcars were needed for shipment purposes. The Etna Tube Mill, comprised of its various sections, was loaded into the first car. The balance of the property was loaded in the remaining car. The loading process was completed on or about August 31, 1956. Thereafter, the shipper closed and sealed the boxcars and the property was delivered into the possession of the initial carrier, the New York Central Railroad.[2] The New York Central issued a 'straight bill of lading' therefor, containing a 'shipper's load and count clause.' The initial carrier transported the property to Welland, Ontario, where the cars were interchanged with the Toronto, Hamilton and Buffalo Railway, a connecting carrier. That carrier moved the goods to Hamilton, Ontario, where another carrier, the Canadian Pacific Railroad, moved the property to Sault Ste. Marie, Michigan. There, the goods were interchanged with the defendant which carried them to their destination in Minneapolis, Minnesota. On Septmber 11, 1956, the first car arrived in Minneapolis; the second car arrived two days later, on September 13th. When the boxcars were opened, extensive damage was found to much of the machinery in each car. Though the cars traveled in separate trains, several days apart, the nature of the damage in each car was identical.
 
 
 4
 Defendant based its defense to plaintiff's claim on allegations that the damage to the property in question was solely caused by the improper loading of the machinery by the shipper and denied any carrier negligence in transit. At the trial it was proved that the machinery as loaded was by the 'integral loading' method into boxcars, the floors of which were of steel. By this method a boxcar is loaded from both ends, ending up in the middle, and wooden blocking is put between the machines so that everything ties together as a unit. By carrier rules and regulations approved by the I.C.C., the shipper was bound to skid such machinery. It was not skidded. A skid provides a wooden frame on which the machine rests during its journey. It serves as a cushion between the floor of the car and the machine itself. It is designed so that wheh the machinery is in the car it will not permit any part of the machine mounted on a skid to come into contact with any other machine on a similar skid, even though the blocking gives way. Defendant claims that blocking alone, the process employed by the shipper here, is no substitute for skidding. It merely is reinforcement; for if the blocking gives way, unless there are skids for the machines, the machines may come in contact with one another during transit. There was testimony by both parties at the trial indicating that skidding was the only responsible method of loading for machinery of this type.[3] Also, there was testimony that the damage to the machinery here considered resulted from their sliding or creeping on the steel floors of the boxcars in which they were carried, the machines striking each other, as well as the ends of the cars, because the bracing and blocking thereof as performed by the shipper gave way. Other specific facts will hereafter be stated in the course of this opinion.
 
 
 5
 The District Court, in its findings of fact, found that though the shipments in questions were blocked, fastened and secured within the two cars, it had not been skidded as required by the defendant's rules; that the shipper had knowledge of defendant's rules as to skidding and that skidding was the shipper's prior regular practice. In a further finding of fact, which defendant claims is unsupported by the evidence, the Court found that the damage to the machinery was 'caused or contributed to, by the defendant or by the initial carrier or one of the connecting carriers over whose line such property passed in that the boxcars were subjected to unusual, abnormal, excessive and unnecessary impact force in handling, but the failure of the shipper to skid contributed to said damage.' (F. of F. XIV.) In the light of such findings of fact, we think it is important to point out that applicable law in an action such as this, is-- where the lading is 'shipper's load and count' and the shipper, in fact, improperly loads the shipment, the shipper is liable therefor (Modern Tool Corp. v. Pennsylvania R. Co., 100 F.Supp. 595 (D.C.N.J.1951)) and the plaintiff must then show that some independent act of negligence on the part of the carrier contributed to cause damage to the shipment, notwithstanding the shipper's negligence, before the carrier can be held liable. Hamilton Mfg. Co. v. Chicago & N.W. Ry. Co., 277 F.2d 652, 653 (7 Cir. 1960); Crump v. Thompson, 171 F.2d 442 (8 Cir. 1948); American Rwy. Express Co. v. Ewing Thomas Converting Co., 292 F. 335, 337, (3 Cir. 1923). The carrier cannot be held liable for the act of the shipper in loading the car improperly without evidence that the defect was patent and apparent by ordinary observation. Modern Tool Corp. v. Pennsylvania R. Co., supra, 100 F.Supp. l.c. 597, and cases there cited. Where, to rebut the prima facie showing of a claimant, the carrier introduces evidence of the good condition of its cars and normal carriage in transit, persuasively excluding the possibility of carrier negligence, such issue cannot be decided as a matter of law. Cf. Chesapeake & O. Ry. Co. v. A. F. Thompson Mfg. Co., 270 U.S. 416, 423, 46 S.Ct. 318, 70 L.Ed. 654 (1926). After a prima facie showing of damage to a shipment has bwen made and the carrier proves that the loss or damage arose from the act of the shipper, the burden of proving some act of the carrier concurred in or contributed to the damage remains with the plaintiff. New York Central R. Co. v. Johnson, 27 F.2d 699, 701 (8 Cir. 1928), reversed on other grounds 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706. Further, a shipper is conclusively bound by the tariff rules of the carrier. Boston etc. R. Co. v. Hooker, supra; Lever Bros, Co. v. Baltimore & O.R. Co., 164 F.2d 738 (4 Cir. 1947); Northern Pac. Ry. Co. v. Van Dusen Harrington Co., 60 F.2d 394 (8 Cir. 1932); Wheelock v. Walsh Fire Clay Products, 60 F.2d 415 (8 Cir. 1932); and parol evidence cannot be received to vary the terms thereof. South Carolina Asparagus Growers' Ass'n v. Southern Ry. Co., 46 F.2d 452 (4 Cir. 1931).
 
 
 6
 To establish carrier negligence in the case at bar, plaintiff adduced deposition evidence indicating that a New York Central inspector, before the cars in question were closed and sealed, inspected the shipment and reported to Houdaille, the shipper, that it was in good order, prior to Houdaille's closing of the cars and their departure from its siding. Plaintiff claims this act waived the shipper's liability for failure to skid the shipment as required by carrier rules. The trial court found that the New York Central, as the initial carrier, did inspect the method and manner of loading and accepted the two boxcars for transportation. The evidence of responsible officers of the shipper was to the effect that they did not rely on any inspection made by the initial carrier. It was their testimony that they were of the opinion the shipment was skidded and had they known it was not skidded they would not have permitted the shipment to be loaded, even if the initial carrier might have accepted it without skids, because of apprehended danger to the shipment from normal movements of cars in the course of transport. That the character of inspection as established by evidence in the case at bar did not constitute a waiver of the 'shipper's load and count' provision of the bill of lading, or the provisions of the carrier's tariff rules requiring skids, is apparent from a consideration of the following authorities: South Carolina Asparagus Growers' Ass'n v. Southern Ry. Co., supra; Delphi Frosted Foods Corp. v. Illinois Central R. Co., 188 F.2d 343 (6 Cir. 1951), cert. den. 342 U.S. 833, 72 S.Ct. 53, 96 L.Ed. 630; Leonard v. Pennsylvania R. Co., 15 F.Supp. 55 (S.D.N.Y.1936); Bronstein v. Baltimore & O.R. Co., 29 F.Supp. 837 (E.D.Penn.1939); Standard Hotel Supply Co. v. Pennsylvania R. Co., 65 F.Supp. 439 (S.D.N.Y.1945); Modern Tool Corp. v. Pennsylvania R. Co., supra. The deposition testimony of the initial carrier's inspector was introduced into evidence by plaintiff. He testified that he 'did not know what a 'shipper's load and count' bill of lading was'; that he 'had never heard of the phrase'; and that he 'never saw the bill of lading issued on these shipments.' There is no evidence that he knew the shipper had specifically agreed with plaintiff to skid the shipment; and, that carrier rules also required that to be done. In South Carolina Asparagus Growers' Ass'n v. Southern Ry. Co., supra, 46 F.2d 1. c. 454, 455, it was said:
 
 
 7
 '* * * as the bill of lading (here considered) was in form and upon a rate approved by the Interstate Commerce Commission, no agent of a carrier could have been authorized to vary its terms for the advantage of a shipper by undertaking additional responsibility on behalf of the carrier. (Citing cases.) Mere knowledge on the part of the local agent of the carrier of the negligent manner in which the shipment (has) been packed could not impose liability for this negligence on the carrier, where the shipper itself (has) expressly undertaken the packing and the injury sustained was due to (its) negligence * * * and not to any negligence on the part of the carrier.'
 
 
 8
 The decision of this Court in Mississippi Valley Barge Line Co. v. Inland Waterways Shippers Ass'n., 289 F.2d 374 (8 Cir. 1961), relating to water shipments under the 'Harter Act' (46 U.S.C.A. 190-196) is not antithetical to the factual situation here and law applicable to rail carrier liability as hereinabove expressed. In the light of the foregoing authorities, we think it is clear there is no merit to plaintiff's contention that defendant's liability for the damages here claimed can in anywise be premised on waiver of carrier rules and regulations or that the shipper relied on the inspection of the shipment as plaintiff now-- belatedly-- seemingly contends. The judgment in the case at bar is not premised on any such findings of fact made by the District Court.
 
 
 9
 By its Findings of Fact IV and V, the District Court found:
 
 
 10
 'IV
 
 
 11
 'Pursuant to agreement or arrangement between plaintiff and Houdaille Industries, Inc., the shipper, such property was loaded by the shipper into two boxcars spotted on the shipper's siding by the New York Central Railroad Co., a common carrier by railroad, hereafter referred to as the initial carrier, the shipper having requested the initial carrier to furnish such cars * * *. Pursuant to said agreement, the shipper promised and agreed with plaintiff, to properly, safely, and securely load said property for shipment to plaintiff. Rule 27 of the Official Consolidated Freight Classfication No. 20, filed with the Interstate Commerce Commission and approved by it, required the shipper to load such property into two boxcars for forwarding by the carriers. The shipper knew this. On the 31st day of August, 1956, or on the day immediately preceding, the shipper completed loading the property into these two boxcars. * * * In loading such property, the shipper blocked, fastened, and secured such property within the two cars. The rules of the Association of American Railroads, of which the New York Central Railroad, and the defendant, were members and which are directed to the members of said association, required that each of the items of machinery and equipment, in addition to being braced, blocked and fastened, be skidded. These rules are embodied in pamphlet No. 21 entitled 'Rules Regulating the Preparation and Safe Loading of Machinery in Closed Cars and Protection of Equipment' and pamphlet (or circular) 42-B which contains general rules. If such machines were skidded in accordance with these association rules, with skids projecting beyond the exterior of each machine, such skidding acts as further protection in the event that the blocking and bracing does not withstand the stresses imposed on it by the movements of the car. The shipper knew this. The shipper had actual knowledge of these association rules, including specifically the requirement for skidding. It had been the shipper's regular practice over a period of many years to skid machinery in accordance with these rules, or in accordance with rules promulgated by the Department of Defense, whichever was the more stringent. In addition, the shipper, pursuant to said agreement, promised and agreed with plaintiff to skid all of said property. The shipper did not skid the machinery, excepting a motor generator set and possibly one other item of machinery. Instead, it placed them, unskidded, on the car floors and blocked, fastened and secured the machinery by using wooden timbers. The shipper loaded the machinery into the cars by a method termed 'integral loading' by which timbers were used to brace from machine to machine and from side to side and from end to end in the cars. In addition, in one car a center bulkhead was built to restrain movement of the property.
 
 
 12
 'V
 
 
 13
 'The property was properly placed, fastened and secured within the two boxcars. However, the property was not skidded as required by the association rules and/or by the shipper's prior regular practice.'
 
 
 14
 By its Finding of Fact XIV, the Court found that 'the failure of the shipper to skid' the machinery in accordance with carrier rules contributed to said damage. The latter finding is inconsistent with Finding of Fact IV, supra. In IV, ante, the Court found: 'Pursuant to agreement the shipper promised * * * to properly, safely and securely load said property for shipment' and 'specifically agreed with plaintiff to skid all of said property.'
 
 
 15
 In the light of the above findings and applicable law, we think it is only necessary to discuss defendant's final contention, that the loading by the shipper having been improper and unsafe, and there being no evidence adduced of negligence, mishap or rough handling by the carrier, in transit, there was insufficient evidence adduced at the trial of this case to predicate a finding of negligence on the part of any carrier, committed in transitu, as found by the trial court. The trial court in its Finding of Fact XIV, said:
 
 
 16
 'It is justifiable to conclude, or it may be inferred, that the damage was caused, or contributed to, by the defendant or by the initial carrier or one of the connecting carriers over whose line such property passed in that the boxcars were subject to unusual, abnormal, excessive or unnecessary impact force in handling, but the failure of the shipper to skid contributed to said damage.'
 
 
 17
 The only evidence introduced at the trial on that subject came from the plaintiff's so-called expert witness, Joseph Sydlowski, the inspector for the New York Central who inspected the loading method employed by the shipper. The following hypothetical question was propounded to him by plaintiff's counsel:
 
 
 18
 'Q. All right, Mr. Sydlowski, I am going to ask you to listen carefully and I am going to relate some facts to you, and when I am all done, I am going to ask you to assume they are correct, and I am going to ask you an opinion in regard to it; assuming we had two cars loaded and examined, and on examination of the two cars you find as you have told us as a result of the inspection, the location of the machinery, the type of blocking and securing that is used, I am referring now to your inspection which you told us about, of car MKT 99610 and CGW 910, assuming the correctness of your * * * the facts as you have related them to us, as to what you found on that inspection, assuming then that these two cars were closed and sealed and transported by train via the New York Central, the Toronto-Hamilton and Black Rock, and the Canadian Pacific and the Soo Line to Minneapolis, Minnesota, that on arrival at Minneapolis, Minnesota, after the doors of the car were opened, photographs were taken and these exhibits which you have seen, marked Defendant's Exhibits 3 through 23, I believe, represent accurately the situation and condition found upon opening those cars. Assuming all that to be true, Mr. Sydlowski, and based upon that assumption and your experience in your job which you have told us about, are you able to form any conclusion as to whether or not this is the type of damage that you have termed and described as impact damage?
 
 
 19
 'A. Yes.
 
 
 20
 'Q. What is your opinion? (Following overruling of defense counsel's objection)
 
 
 21
 'A. That it is impact damage in transit.'
 
 
 22
 He had previously testified that 'impact damage' is the type of damage that occurs when there is an 'excessive fetch-up of cars' where the cars strike hard against one another sometimes during 'switching movement or movement of the car.' There is no evidence in the record of this case of any such occurrence, as hereinafter made clear.
 
 
 23
 Defendant duly objected to the above hypothetical testimony on specifically stated grounds, also that no proper foundation was laid in the evidence of this case, or by the testimony of Sydlowski for the hypothetical question asked of him. It also asserted that the question:
 
 
 24
 '* * * gave no inkling as to how or where the cars were carried, or what connections they made, or what had occurred en route. It did not include any of the undisputed facts, e.g. that no untoward event had occurred; that the cars traveled several days apart in separate trains, that there was no substantial damage to the cargo in other cars, etc. It did not give or assume any premises as to the manner of transport, including switching, as a basis for a conclusion.'
 
 
 25
 Plaintiff claims, on the other hand, that the hypothesis for such a question need not contain such matter, or all the facts introduced in testimony, but may take a limited selection and obtain an opinion on the above-stated facts, so long as an intelligent opinion may be rendered by the witness.
 
 
 26
 We do not here consider the propriety of the contentions made by the parties in respect to the ruling of the District Court as made to the above hypothetical question. We recognize the law to be, that a sound discretion may be exercised by a trial judge over the subject matter covered in a hypothetical question. Laughlin v. Christiansen, 1 F.2d 215 (8 Cir. 1924); Metropolitan Life Ins. Co. v. Armstrong, 85 F.2d 187 (8 Cir. 1936). Also, that upon objection to such a question, a trial court may, if it so desires, require counsel to supply additional facts if the question is framed inadequately; and some courts hold that no error is committed where the question is allowed as framed since the opposing counsel, on cross-examination, may supply whatever additional facts he feels will have a bearing on the expert's opinion. Standard Oil Co. of Cal. v. Moore, 251 F.2d 188 (9 Cir. 1957). Failure to frame a question which has as its basis all the disputed or material facts in evidence does not always make that question improper. New York Central R. Co. v. Johnson, supra.
 
 
 27
 In this appeal we only consider the answer given to the facts stated in the above hypothesis from the standpoint of whether the same may be considered as competent evidence to sustain the findings of fact as here made by the District Court. In other words, the test we apply is whether, having due regard to the opportunity of the trial judge, sitting without a jury, to determine the credibility of witnesses, its finding of fact based on the answer to such hypothesis is clearly erroneous. On appeal, we may 'correct clear error, even in findings of fact,' (United States v. Yellow Cab Co.,338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949)) if on the 'entire evidence (we are) left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). It is manifest from the record here and findings of fact as made by the District Court, that the answer made to the above hypothetical question is the only possible testimony given in this case upon which the trial court could reach, as it did, tis conclusion of carrier causation of damages. There is no other buttressing testimony in this record that some independent act of negligence committed by defendant reasonably contributed to the damage to the shipments in question. Hence, we think that the trial court would have had no choice but to find that defendant was not negligent without Sydlowski's answers infra. Finding as it did that the shipper contributed to the damage by its failure to skid, the carrier could only be made liable if some negligence on its part caused or contributed to the damage to such shipment. Hamilton Mfg. Co. v. Chicago & N. W. Ry. Co., supra. Carrier negligence cannot be inferred unless based on some competent testimony in the record. An opinion answer may not ordinarily be based on an expert's knowledge of fact not adduced in evidence. (Cf. Raub v. Carpenter, 187 U.S. 159, 23 S.Ct. 72, 47 L.Ed. 119; United States v. Sampson, 79 F.2d 131 (9 Cir. 1935)). Thus, it is our opinion that the hypothesis of the above question as framed was insufficient in and of itself to constitute proof of carrier causation of damage on the record here. We emphasize the latter matter because our opinion that it was insufficient is based solely on the facts found in this record; and we do not mean it to extend any further than the particular facts here presented. For all we hold is that, under this record, it was error to base a judgment of carrier negligence on such hypothesis alone, when other material, undisputed facts were very apparently not taken into consideration.
 
 
 28
 The following undisputed facts appear in the record of this case:
 
 
 29
 No collision or untoward accident which would be likely to cause the damage here sustained occurred during transit. It was admitted at the trial that the so-called 'wheel reports' contained no notation of any unusual incident, nor reference to any such accident. However, such reports only cover the movements of the train while in transit. They do not cover any incident which might occur in switching operations. Thus, on the basis of the trial court's own finding, it would have to be inferred that unusual and unnecessary impact force in handling of the property had to take place in the switching yards. Yet it was undisputed at the trial that there were no 'hump yards' between the Houdaille siding and Sault Ste. Marie, Michigan. That type of coupling necessarily produces some impact as the cars come together. The type of switching used for these trains, however, was established as 'flat switching.' All the testimony in the record is that flat switching does not require an impact. As stated in deposition of plaintiff's own witness, a trainmaster for the New York Central: 'The couplers are of such a nature that when two come together, the coupler is moved in a circular motion of approximately six inches. The turning allows the pin to drop and it does not require an impact, merely a coming together.' It seems to us that it is highly unlikely that the damage to these machines could have been caused by any showing of cars 'merely coming together.' Plaintiff's evidence was that there was no 'indication that any piece of machinery had been nailed, bolted or otherwise attached to or secured to the floor of the car'; that the shipments were 'very poorly blocked' and that 'inevitably there is some movement of freight back and forth and up and down when the train is in motion, and a certain amount of slack action in a train which occurs from the coupling of the freight cars and the fact that they are not rigidly attached to one another,' in the normal movement of a train.
 
 
 30
 It was undisputed that the trains in which the cars traveled arrived separately, two days apart. It is undisputed that there was no damage to the contents of 58 adjacent cars to those carrying the shipment here considered, except a minor claim to a piece of furniture carried in one car. Is it reasonable under the circumstances to assume that the identical damage to these machines was caused by the same unnecessary force in switching or by improper loading? In Banner Mfg. Co. v. Long Island Railroad Co., 277 App.Div. 142, 97 N.Y.S.2d 730 (1950), court there had an occasion to comment on the same happenstance. Ther, cans of brake fluid, packed in cases were loaded into boxcars and upon their arrival were found smashed. The cans had been loaded into twenty different boxcars and left the yard in three or four different trains. The trains traveled on different days, yet the damage to the items was identical. The Court stated: 'It would seem improbable that each train would be mishandled to the extent necessary to effect the damage done. It is * * * more probable that the damage resulted from a condition that was common to all cars, that is, from the way they were loaded.' At 97 N.Y.S.2d 734. Though in that case four trains-- not two-- were involved, it seems to us that the same reasoning there employed is applicable here.
 
 
 31
 Defendant's evidence was to the effect that the damage was caused by the shipper's failure to properly skid and prepare the machines for loading into the cars, and that if such had been done the machines could not have come in contact with each other. Furthermore, it was established that if properly skidded this would protect the machines against 'the ordinary incidents of transport, such as switching,' and that, if skidded, any injury thereto would not occur, short of collision. Also, that if skidded, 'switching operations, whether conducted gently or not, not involving collision or derailment, could not have caused the injury that is claimed in this case.' Defendant's witness's testimony in that respect was substantiated by the testimony of Walter Peuchen, the plant engineer of Houdaille, the shipper, that he would not have let the loads go out if he knew they had not been skidded, even if the initial carrier would accept them, for if not skidded the machines could break their bracing and slide loose in the car. This seems most reasonable where steel machinery is laid on a steel floor of a boxcar, without attachment to the floor except by bracing, as this shipment was loaded.
 
 
 32
 Taken as a whole, the testimony as adduced in the case at bar clearly makes it difficult for this Court to agree with the trial court's opinion that the damage was caused by 'unusual, abnormal, excessive and unnecessary impact force in handling.' Though we are, as always, reluctant to overrule the findings of a trial court judge, the duty of this Court is clear. We must set aside findings of fact that are induced by an apparent erroneous view of the law and for which there is no reasonable basis in the evidence. Arkansas Valley Feed Mills, Inc. v. Fox De Luxe Foods, Inc., 273 F.2d 804 (8 Cir. 1960); Western Surety Co. v. Redman Rice Mills, Inc., 271 F.2d 885 (8 Cir. 1959); Gross v. Fidelity & Deposit Co. of Maryland, 302 F.2d 338 (8 Cir. 1962). Therefore, we are forced to conclude that the finding as to carrier causation of the damage here considered was not supported by sufficient evidence adduced at the trial of this case to sustain the findings of fact as made by the District Court and the judgment entered thereon against this carrier.
 
 
 33
 The judgment of the trial court is reversed and remanded.
 
 
 34
 Such disposition of the appeal in Number 17038 makes moot any issue raised in Case Number 17039. Hence, the appeal in the latter case is dismissed.
 
 
 
 [1]
 Plaintiff within the applicable limitation period, commenced an identical action for damages in the United States District Court for the Western District of New York against the initial carrier and the shipper of the goods. Further proceedings in that action have been stayed pending final determination of this appeal
 
 
 [2]
 Appellee's contention that the initial carrier inspected and approved the manner of loading before the cars were sealed, is hereinafter specifically considered
 
 
 [3]
 There is no merit to plaintiff's contention that 'the shipper was not bound to follow the carrier's rules as to skidding, and skidding was not required for the type of machinery here involved,' in the light of applicable law and the unchallenged findings of fact as made by the District Court