**John C. THOMAS, Appellee,**

v.

**TRANS WORLD AIRLINES, INC., Appellant.**

**No. 71-1005.**

United States Court of Appeals, Third Circuit.

Submitted Dec. 6, 1971 under 3rd Cir. Rule 12(6).

Decided March 15, 1972.

David F. Norcross, Archer, Greiner, Hunter & Read, Camden, N. J., for appellant.

Samuel Kalikman, Haddonfield, N. J., for appellee.

Before HASTIE, ALDISERT and JAMES ROSEN, Circuit Judges.

## OPINION OF THE COURT

JAMES ROSEN, Circuit Judge.

Appellee, John C. Thomas, filed suit in the United States District Court for the District of New Jersey to recover damages for the negligent carriage of freight by appellant, Trans World Airlines, Inc., between Philadelphia, Pa. and Sioux Falls, South Dakota, and recovered a judgment in the amount of $5,450.64. This appeal followed.

Appellee is a registered professional engineer engaged in the business of manufacturing swivel assemblies. These assemblies are designed for use on parachutes which carry bombs. As such, they are subject to rigid standards of inspection by the purchasing contractors and government inspectors before they are accepted for installation.[1]

On January 23, 1968, Thomas delivered a carton of swivel assemblies to TWA at its Philadelphia International Airport terminal for shipment by air freight to Sioux Falls, South Dakota. The carton contained approximately 6,000 units. The estimated cost of each unit is $.98.[2] A domestic airbill was filled out by appellant's freight agent, B. Snyder, and signed by Thomas. The relevant portion of this airbill has to do with a box for declared value. Alongside of this box there is printed the following language:

"Declared value. Agreed and understood to be not more than the value stated in the governing tariffs for each pound on which charges are assessed unless a higher value is declared and applicable charges paid thereon."

The airbill issued to Thomas by agent Snyder shows that no value was entered in the declared value box. Under the weight category appears the entry "80 as 100." This entry was explained as representing the carrier's minimum weight (100), below which the same charges were levied regardless of the actual shipper's weight.[3] Since a higher

---

1. Plaintiff testified that certain tests were usually made of random samples of each lot, but that, in this case, neither the government nor the consignee made any tests of the assemblies, apparently because they were plainly unacceptable. On return of the shipment, plaintiff testified that he tried to clean the assemblies, and that after performing a limited inspection of approximately 300 units, 275 of them were found to be unsatisfactory. Ulti-mately, the entire shipment was disposed of as entirely worthless.

2. Tr. p. 21.

3. Mr. Snyder explained the weight designation this way:
   "Q. What does eighty as 100 mean?
   "A. Eighty is the actual weight and as 100 means the rate we are giving to the shipper going as the 100 pound rate.

value was not declared in the airbill, the freight charges were assessed on the basis of the minimum valuation stated in TWA's governing tariffs. The airbill also contains general language stipulating that the parties mutually agree that the goods are subject to the governing classification and tariffs currently in effect and that "said classification and tariffs, copies of which are available for inspection by the parties hereto, are hereby incorporated into and made part of this contract."

When the swivel assemblies reached the consignee at Sioux Falls, they were rejected because they were "very dirty," and the entire shipment was returned to appellee. The complaint was filed on June 4, 1968, and jurisdiction was alleged to be under 49 U.S.C. § 20(11) [4] and 28 U.S.C. § 1337. The appellant made an offer of judgment in the amount of $50.00, pursuant to Rule 68 of the Federal Rules of Civil Procedure, which was rejected. The case came to trial without a jury on September 28, 1970 and judgment was rendered for plaintiff on October 22, 1970.

The defense interposed by TWA is predicated upon Tariff Rules 26, 32 and 52, on file with the Civil Aeronautics Board on January 23, 1968. The pertinent sections provide as follows:

### Rule 26. AIRBILL AND SHIPPING DOCUMENTS

(A) The shipper shall prepare and present a nonnegotiable Airbill with each shipment tendered for transportation subject to this tariff and tariffs governed hereby. If the shipper fails to present such Airbill, the carrier will prepare a nonnegotiable Airbill for transportation subject to

"Q. Why is that?
"A. It depends on the cost of the shipment. Under a hundred pounds is what we have as a minimum charge, there is a fifty pound minimum, then we go to a per pound rate. Now, we give him this per pound rate until it reaches a certain point where it would be cheap-

tariffs in effect on the date of acceptance of such shipment by the carrier and the shipper shall be bound by such Airbill.

(F) No agent, servant or representative of carrier has authority to alter, modify or waive any provisions of the contract of carriage or of this tariff.

\* \* \* \* \* \*

### Rule 32. LIMIT OF LIABILITY

(A) In consideration of carrier's rate for the transportation of any shipment, which rate, in part, is dependent upon the value of the shipment as determined pursuant to Rule 52, the shipper and all other parties having an interest in the shipment agree that the value of the shipment shall be determined in accordance with the provisions of Rule 52 and that the total liability of the carrier shall in no event exceed the value of the shipment as so determined.

\* \* \* \* \* \*

### Rule 52. CHARGES FOR DECLARED VALUE

(A) Except as provided in paragraph (D) of this rule, a shipment shall have a declared value of $.50 per pound (but not less than $50.00) unless a higher value is declared on the Airbill at the time of receipt of the shipment from the shipper, and if a higher value is so declared, an additional transportation charge of $0.10 shall be required for each $100.00 (or fraction thereof) by which such higher value exceeds $.50 per pound or $50.00, whichever is higher.

er shipping it as 100 pound weight. And we also give the shipper a cheaper rate."
Tr. pp. 110–111-Appellant's App. 132A

4. This reference to the Interstate Commerce Act was later expunged and 49 U.S.C. § 1301 et seq. was substituted.

As a general rule, a shipper is conclusively bound by tariff rules of a carrier and parol evidence cannot be received to vary the terms thereof. Minneapolis, St. P. and S. S. M. R. Co. v. Metal-Matic, Inc., 323 F.2d 903 (8th Cir. 1963). However, "[i]t is elementary that courts of equity have jurisdiction to relieve parties against the consequences of mutual mistake of fact and to grant reformation in case of such a mistake. Indeed, when no question of fraud, bad faith, or inequitable conduct is involved and the right to reform an instrument is based solely on a mistake, it is necessary that the mistake be mutual, and that both parties understood the contract as the complaint or petition alleges it ought to have been, and as in fact it was except for the mistake; . . ." 45 Am. Jur., Reformation of Instruments, § 55, page 617; Stevens v. Illinois Central Railroad Co., 234 F.2d 562, footnote 4 (5th Cir. 1956).

Mere failure to read an instrument, thus giving rise to plaintiff's unilateral mistake, is insufficient to obtain relief. *Stevens, supra.*[5] A mistake by one party coupled with ignorance thereof by the other party does not constitute a mutual mistake. United States For Use and Benefit of Spector v. Fusco-Amatruda, 239 F.Supp. 990 (D.C.Conn. 1965).

The only evidence, beyond the airbill itself, of what happened on that occasion appears in the testimony of the shipper himself. Understandably, the carrier's agent had no recollection of the particular transaction.

The shipper testified as follows:

" . . . I backed the automobile up, took the items in and put them on the scale, then you come outside on the platform and go through the door into this little office. I went there and there were four or five TWA employees in there. That's the reason I wouldn't know Mr. Snyder. But I showed him a swivel assembly.

"Q. You showed who?

"A. The gentleman who was waiting on me, whom I will assume is Mr. Snyder.

"Q. Is this in the office or where the scale is?

"A. In the office. I handed him a swivel assembly and it was passed back amongst the people, and since I had been there previously, they were aware of it and I explained to them again how it went on a piece of ammunition in the parachute and told them the value of it.

"Q. What did you say, if you can recall as near as possible?

"A. I said there was approximately 6,000 units valued at $.98 a piece.

"Q. Did you say anything to them or did they say anything to you?

"A. I showed it to the people in back of the counter and basically that was it. I signed the chit and I was tired and sleepy, as you would be after producing these, and I went home and went to bed, very frankly."

The district court found this evidence sufficient to establish that the omission of a valuation item in the airbill resulted from such mutual mistake as justified a reformation of the instrument to include a valuation of $6,000. In making this finding the district court recognized that the evidence of mutual mistake "must be clear and convincing." In our view, the present record does not warrant such a finding.

In the district court's opinion, Dover Farms, Inc. v. American Air

---

5. See also Watson v. United States Fidelity and Guaranty Co., 427 F.2d 1355 (9th Cir. 1970) where the following discussion appears:

"But 'reformation is not a proper remedy for the enforcement of terms to which the defendant never assented; it is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed.' 3 Corbin, Contracts § 614, at 723 (1960 ed.)"

Lines, Inc., 111 N.J.Super. 276, 268 A.2d 289 (App.Div.1970) cert. denied 57 N.J. 140, 270 A.2d 43 (1970), offered a sound basis in finding for Thomas. In *Dover Farms*, the shipper failed to have a higher value entered on the airbill, and a cargo of 8000 baby chicks was later delivered in a damaged condition as a result of the carrier's negligence. It was proven that the shipper's agent gave the carrier's freight agent a copy of plaintiff's invoice, showing the value of the chicks, which was signed by defendant's clerk and returned to the plaintiff's agent. Also attached to the invoice was a written instruction sheet which contained directions to the defendant to insure the chicks for the "full value" as noted on the plaintiff's invoice. Nevertheless, the completed airbill, returned by defendant's clerk to plaintiff's driver, contained no "Declared Value". The court held that the shipper was entitled to the full value of the shipment where the failure to state the value on the airbill was the result of mutual mistake of the parties' agent. "The contract between the parties, the air bill, being the product of an honest mistake, will be reformed to meet the true intent of the parties. This may be done without violating any existing federal tariff or regulation." At p. 282, 268 A.2d at p. 292. The court in *Dover Farms* had substantial reason to grant reformation. The

evidence was clear and cogent that a mutual mistake had in fact occurred: The plaintiff's invoice was receipted by the freight agent; the full actual value of the cargo was stated thereon; a written instruction sheet was attached to the invoice directing the carrier's agent to insure at full value. The evidence clearly supported the court's finding that, but for the mutual mistake of the agents of the parties, the shipment of 8000 baby chicks would have been insured at actual value and the commensurate freight charges levied.

Here Thomas testified at trial that he signed the airbill without reading it, and didn't tell anyone in the freight office to insert a $6000. figure in the declared value box, because "I didn't think I had to".[6] His statement that the shipment contained 6,000 swivels and that each was worth 98 cents was made in the course of a conversation with airline employees who were in the receiving office and expressed curiosity about these unfamiliar articles. The swivels were small assemblies designed for attachment to parachutes for ammunition. In these circumstances, the shipper exhibited some loose swivels in his possession to the agent waiting on him and to other persons in the office, explained the use of the article, and stated both the unit value and the value of the entire shipment.[7]

6. Tr. p. 58 and p. 69.
7. On cross-examination the shipper testified as follows:
   "Q. How close was the other person or persons to the gentleman who was filling out the ticket?
   "A. Relatively close because the whole office area is relatively small.
   "Q. Were you speaking to all of them?
   "A. Yes.
   "Q. And in speaking to all of them could you tell me what you said to all of them?
   "A. I can't give you the exact words, but I do know I showed the swivel assembly and explained its use and its value.
   "Q. Were they interested in what the swivel assembly was?
   "A. Yes, that's one thing that stood out.

   "Q. It was sort of a curious piece of equipment?
   "A. Yes.
   "Q. Did they inquire of you what it was for?
   "A. They inquired what it was used for.
   "Q. And you told them?
   "A. Yes.
   "Q. And as a part of this conversation the value came out; is that correct?
   "A. True.
   "Q. Now, there was one particular agent actually filling out your air bill; is that right?
   "A. I can't truthfully say that he filled out everything on there, but I am sure he did. I wasn't watching to see if he passed it back and forth. He was standing at the counter

A disclosure of the value of a shipment made in these circumstances is not an unambiguous statement to a receiving agent of a "declared value" to be entered on the bill of lading for use as a basis for excess liability and higher shipping charges. The receiving agent could reasonably have understood the shipper's entire exposition about the swivels was no more than an undertaking to satisfy the curiosity of those present about an unusual little item of military equipment. Indeed, the agent's failure to enter $6,000 as the "declared value" or to charge the shipper accordingly can as reasonably be attributed to that understanding of the shipper's meaning as to oversight after a comprehended instruction to enter $6,000 as the "declared value" of the shipment.

This distinction is important because appellant's claim is based upon the theory of mutual mistake or oversight after both parties had understood that $6,000 was the "declared value" of the shipment. Yet, the record is at least as consistent with misunderstanding of the shipper's intention, as a result of which the carrier's agent never intended to enter or charge for any excess "declared value." In these circumstances, the plaintiff's evidence was inadequate to support a finding that the omission of a "declared value" from the airbill resulted from mutual mistake. Thus, the obligation of the carrier must be determined solely from the recitals of the written contract itself.

For these reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

ALDISERT, Circuit Judge (concurring).

To make the award for the plaintiff in the non-jury proceeding, the trial

court had to find as a fact that there was a mutual mistake: that the parties had understood that $6,000 was the "declared value" of the shipment. This critical finding controls the outcome. "In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are 'left with a firm conviction that a mistake has been committed.'" Speyer, Inc. v. Humble Oil & Refining Co., 403 F.2d 766, 770 (3d Cir. 1968). F.R.Civ.P. 52. Applying this standard to the record, I am convinced that "a mistake has been committed" in the court's finding of mutual mistake. I would therefore vacate the judgment and remand.

---

filling it out and he went back to the back to look up the routing section. But it would be my assumption that he filled out the entire billing. I didn't stand there and watch him fill out everything.

"Q. It's true that you don't remember whom you made this $6,000.00 observation to?

"A. I know I made it to the gentleman standing at the counter."